# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **JENNIFER A. WINTER, individually and as Personal Representative of the Estate of EDWARD JORDAN WINTER, Deceased,** | § § § § | **CASE NO.** 25-1612 |
| Plaintiffs, | § § | **CIVIL ACTION COMPLAINT** |
| v. | § § | **JURY TRIAL DEMANDED** |
| **ALBERTSONS COMPANIES, INC.** | § § | |
| **BAYER CONSUMER CARE HOLDINGS LLC** f/k/a BAYER CONSUMER CARE LLC, f/k/a MSD CONSUMER CARE, INC. | § § § § | |
| **BAYER HEALTHCARE LLC** a subsidiary of BAYER AG | § § § | |
| **BAYER SAMSON II LLC** f/k/a DR. SCHOLL'S LLC | § § § | |
| **BLOCK DRUG COMPANY, INC.** individually and as successor to THE GOLD BOND STERILIZING POWDER CO. a/k/a THE GOLD BOND CO. | § § § § § | |
| **CONOPCO INC.** | § § | |
| **COSMETIC SPECIALTIES, INC.** | § § | |
| **COTY INC.** individually and as successor-in-interest to COVERGIRL COSMETICS, INC. and THE NOXEMA CHEMICAL COMPANY | § § § § § | |
| **CVS PHARMACY, INC.** | § § | |
| **DANA CLASSIC FRAGRANCES, INC.** | § § | |
| **E.L.F. COSMETICS, INC.** | § § | |
| **THE ESTÉE LAUDER COMPANIES INC.** | § | |

individually and as successor-in-interest to BOBBI
BROWN PROFESSIONAL COSMETICS, INC.,
CLINIQUE, TOM FORD, and MAKE-UP ART
COSMETICS, INC.

**ESTÉE LAUDER INC.**
individually and as successor-in-interest to BOBBI
BROWN PROFESSIONAL COSMETICS, INC.,
CLINIQUE, TOM FORD, and MAKE-UP ART
COSMETICS, INC.

**ESTÉE LAUDER INTERNATIONAL, INC.**
individually and as successor-in-interest to BOBBI
BROWN PROFESSIONAL COSMETICS, INC.,
CLINIQUE, TOM FORD, and MAKE-UP ART
COSMETICS, INC.

**EXCLUSIVE FRAGRANCES & COSMETICS
INC.**

**GOLD BOND CO LLC**

**IMI FABI (DIANA) LLC**

**IMI FABI (USA) INC.**

**IMI FABI, LLC**

**INTERCOS AMERICA, INC.**

**JOHNSON & JOHNSON**

**JOHNSON & JOHNSON HOLDCO (NA) (NJ)
INC.**
(a/k/a "New JJCI/Holdco") (f/k/a JOHNSON &
JOHNSON CONSUMER INC.), individually and
as successor-in-interest to JOHNSON &
JOHNSON CONSUMER INC. (a/k/a "Old JJCI")

**JOHNSON & JOHNSON HOLDCO (NA) INC.**
f/k/a J&J Intermediate Holding Corp.; individually
and as successor-in-interest to J&J HOLDCO
(NA) LLC (a/k/a "New Holdco (Texas)")

**KENVUE INC.**

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

individually and as successor-in-interest to
JOHNSON & JOHNSON CONSUMER INC.
(a/k/a "Old JJCI") and JOHNSON & JOHNSON
HOLDCO (NA) INC. (a/k/a "NEW
JJCI/HOLDCO") (f/k/a JOHNSON & JOHNSON
CONSUMER INC.)

**KENVUE BRANDS, LLC f/k/a JOHNSON &
JOHNSON CONSUMER INC.**
(a/k/a "JJCI 3.0") individually and as successor-in-
interest to JOHNSON & JOHNSON CONSUMER
INC. (a/k/a "Old JJCI") and JOHNSON &
JOHNSON HOLDCO (NA) INC. (a/k/a "New
JJCI/Holdco") (f/k/a Johnson & Johnson
Consumer Inc.)

**THE KROGER CO.**

**L'ORÉAL USA PRODUCTS, INC.**
individually and d/b/a LANCÔME and
MAYBELLINE

**L'ORÉAL USA, INC.**
individually and d/b/a LANCÔME and
MAYBELLINE

**LLT MANAGEMENT LLC**
f/k/a LTL MANAGEMENT LLC

**MACY'S, INC.**

**MARTIN HIMMEL INC.**

**MARY KAY INC.**

**MERCK & CO., INC.**

**MINERALS TECHNOLOGIES**

**MIYOSHI AMERICA, INC.**

**NOXELL CORPORATION**
a subsidiary of COTY INC.

**PECOS RIVER TALC LLC**

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

**PFIZER INC.**
  individually and as successor-in-interest to COTY
  INC. and COTY INTERNATIONAL, INC.

**RALPH LAUREN CORPORATION**

**SAFEWAY INC.**

**SANOFI-AVENTIS U.S. LLC**
  individually and as successor-in-interest to GOLD
  BOND CO LLC

**SCHOLL'S WELLNESS COMPANY LLC**

**SPECIALTY MINERALS INC.**

**THE STEPHAN CO.**
  individually and as successor-by-merger to OLD
  97 COMPANY

**TARGET CORPORATION**

**ULTRA CHEMICAL, INC.**

**WALGREEN CO.**

**WALMART INC.**

**YELLOW WOOD PARTNERS, LLC**

              Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

## COMPLAINT FOR A CIVIL CASE

Plaintiffs sue the above-named Defendants for compensatory and punitive damages, by and through their undersigned attorneys, and hereby bring this Civil Complaint, and allege:

## I.    PARTIES

**A.    The Plaintiffs**

1.    **EDWARD JORDAN WINTER** is referred to as "Decedent" in this Complaint.

2.    Jennifer A. Winter is Decedent's spouse, and Personal Representative of the Estate of Edward Jordan Winter and brings this action on behalf of herself and Decedent's Estate for

their damages and the damages of her and Decedent's minor children J.W., E.W., C.W. and V.W.

3.   Decedent was diagnosed with malignant pleural mesothelioma on or about December 11, 2023.

4.   Asbestos caused Decedent's disease and subsequent death on May 1, 2024.

5.   Plaintiff Jennifer A. Winter and Edward Jordan Winter were married at the time of his death.

6.   Jennifer A. Winter and Edward Jordan Winter were married on July 10, 2009, and resided in the State of Indiana until approximately 2021,where a significant amount of his exposure to Defendants' asbestos containing talc occurred. Plaintiff is a current resident of the State of Michigan.

**B.   The Defendants**

7.   The Defendant ALBERTSONS COMPANIES, INC., a talc defendant, is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Idaho and does business in the State of Indiana.

8.   The Defendant BAYER CONSUMER CARE HOLDINGS LLC, f/k/a BAYER CONSUMER CARE LLC, f/k/a MSD CONSUMER CARE, INC., a talc defendant, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

9.   The Defendant BAYER HEALTHCARE LLC, a subsidiary of BAYER AG, a talc defendant, is limited liability company organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

10.    The Defendant BAYER SAMSON II LLC, f/k/a DR. SCHOLL'S LLC, a talc defendant, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in the State of Ohio, and does business in the State of Indiana.

11.    The Defendant BLOCK DRUG COMPANY, INC., individually and as successor to THE GOLD BOND STERILIZING POWDER CO. a/k/a THE GOLD BOND CO., a talc defendant, is a corporation incorporated under the laws of the State of New Jersey, with  its principal place of business in the Commonwealth of Pennsylvania and does business in the State of Indiana.

12.    The Defendant CONOPCO INC., a talc defendant, is a corporation incorporated under the laws of the State of New York, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

13.    The Defendant COSMETIC SPECIALTIES, INC., a talc defendant, is a corporation incorporated in the State of New Jersey, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

14.    The Defendant COTY INC., a talc defendant, individually and as successor-in-interest to COVERGIRL COSMETICS, INC. and THE NOXZEMA CHEMICAL COMPANY, is a corporation incorporated in the State of Delaware, with  its principal place of business in the State of New York, and does business in the State of Indiana.

15.    The Defendant CVS PHARMACY, INC., a talc defendant, is a corporation incorporated in the State of Rhode Island, with its principal place of business in the State of Rhode Island and does business in the State of Indiana.

16.  The Defendant DANA CLASSIC FRAGRANCES, INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New York and does business in the State of Indiana.

17.  The Defendant E.L.F. COSMETICS, INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of California and does business in the State of Indiana.

18.  The Defendant THE ESTÉE LAUDER COMPANIES INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New York and does business in the State of Indiana.

19.  The Defendant ESTÉE LAUDER INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New York and does business in the State of Indiana.

20.  The Defendant ESTÉE LAUDER INTERNATIONAL, INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New York and does business in the State of Indiana.

21.  The Defendant EXCLUSIVE FRAGRANCES & COSMETICS INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of Connecticut and does business in the State of Indiana.

22.  The Defendant GOLD BOND CO LLC, a talc defendant, is a limited liability company organized under the laws of the State of North Carolina, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

23. The Defendant IMI FABI (DIANA) LLC, a talc defendant, is a limited liability company organized under the laws of the State of North Carolina, with its principal place of business in the State of West Virginia and does business in the State of Indiana.

24. The Defendant IMI FABI (USA) INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of West Virginia and does business in the State of Indiana.

25. The Defendant IMI FABI LLC, a talc defendant, is a limited liability company organized under the laws of the State of West Virginia, with its principal place of business in the State of West Virginia and does business in the State of Indiana.

26. The Defendant INTERCOS AMERICA, INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New York and does business in the State of Indiana.

27. The Defendant JOHNSON & JOHNSON, a talc defendant, is a corporation incorporated in the State of New Jersey, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

28. The Defendant JOHNSON & JOHNSON HOLDCO (NA) (NJ) INC. (a/k/a "New JJCI/Holdco"), (f/k/a JOHNSON & JOHNSON CONSUMER INC.) individually and as successor-in-interest to JOHNSON & JOHNSON CONSUMER INC. (a/k/a "Old JJCI"), a talc defendant, is a corporation incorporated in the State of New Jersey, with its principal place of business in the State of New Jersey, and does business in the State of Indiana.

29. The  Defendant JOHNSON & JOHNSON HOLDCO (NA) INC. f/k/a J&J INTERMEDIATE HOLDING CORP., individually and as successor-in-interest to J&J HOLDCO (NA) LLC (a/k/a "NEW HOLDCO (TEXAS)"), a talc defendant, is a corporation

incorporated in the State of New Jersey, with its principal place of business in the State of New Jersey, and does business in the State of Indiana.

30. The Defendant KENVUE INC., individually and as successor-in-interest to JOHNSON & JOHNSON CONSUMER INC. (a/k/a "OLD JJCI") and JOHNSON & JOHNSON HOLDCO (NA) INC. (a/k/a "New JJCI/Holdco")(f/k/a JOHNSON & JOHNSON CONSUMER INC.), a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New Jersey, and does business in the State of Indiana.

31. The Defendant KENVUE BRANDS, LLC f/k/a JOHNSON & JOHNSON CONSUMER INC. (a/k/a "JJCI 3.0"),  individually and as successor-in-interest to JOHNSON & JOHNSON CONSUMER INC. (a/k/a "Old JJCI") and JOHNSON & JOHNSON HOLDCO (NA) INC. (a/k/a "New JJCI/Holdco") (f/k/a JOHNSON & JOHNSON CONSUMER INC.), a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New Jersey, and does business in the State of Indiana.

32. The Defendant THE KROGER CO., a talc defendant, is a corporation incorporated in the State of Ohio, with its principal place of business in the State of Ohio and does business in the State of Indiana.

33. The Defendant L'ORÉAL USA PRODUCTS, INC., individually and d/b/a LANCÔME and MAYBELLINE, a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New York, and does business in the State of Indiana.

34. The Defendant L'ORÉAL USA, INC., individually and d/b/a LANCÔME and MAYBELLINE, a talc defendant, is a corporation incorporated in the State of Delaware, with

its principal place of business in the State of New York, and does business in the State of Indiana.

35. The Defendant LLT MANAGEMENT LLC, f/k/a LTL MANAGEMENT LLC, a talc defendant, is or was a corporation incorporated in the State of Texas, with its principal place of business in the State of New Jersey, and does business in the State of Indiana.

36. The Defendant MACY'S, INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New York and does business in the State of Indiana.

37. The Defendant MARTIN HIMMEL INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of Florida and does business in the State of Indiana.

38. The Defendant MARY KAY INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of Texas and does business in the State of Indiana.

39. The Defendant MERCK & CO., INC., a talc defendant, is a corporation incorporated in the State of New Jersey, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

40. The Defendant MINERALS TECHNOLOGIES INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New York and does business in the State of Indiana.

41. The Defendant MIYOSHI AMERICA, INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of Connecticut, and does business in the State of Indiana.

42.   The Defendant, NOXELL CORPORATION, a subsidiary of COTY INC., a talc defendant, is a corporation incorporated in the State of Maryland, with its principal place of business in the State of Maryland and does business in the State of Indiana.

43.   The Defendant, PECOS RIVER TALC LLC, a talc defendant, is a corporation incorporated in the State of Texas, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

44.   The Defendant PFIZER INC., individually and as successor-in-interest to COTY INC. and COTY INTERNATIONAL, INC., is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New York, and does business in the State of Indiana.

45.   The Defendant RALPH LAUREN CORPORATION, a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

46.   The Defendant SAFEWAY INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of California and does business in the State of Indiana.

47.   The Defendant SANOFI-AVENTIS U.S. LLC, individually and as successor-in-interest to Gold Bond Co LLC, a talc defendant, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey, and does business in the State of Indiana.

48.   The Defendant SCHOLL'S WELLNESS COMPANY LLC, a talc defendant, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

49.   The Defendant SPECIALTY MINERALS, INC., a talc defendant, is and was a corporation incorporated in the State of Delaware, with its principal place of business in the State of New York and does business in the State of Indiana.

50.   The Defendant THE STEPHAN CO., individually and as successor-by-merger to OLD 97 COMPANY, a talc defendant, is a corporation incorporated in the State of Florida, with its principal place of business in the Commonwealth of Pennsylvania, and does business in the State of Indiana.

51.   The Defendant TARGET CORPORATION, a talc defendant, is a corporation incorporated in the State of Minnesota, with its principal place of business in the State of Minnesota and does business in the State of Indiana.

52.   The Defendant ULTRA CHEMICAL, INC., a talc defendant, is a corporation incorporated in the State of New Jersey, with its principal place of business in the State of New Jersey and does business in the State of Indiana.

53.   The Defendant WALGREEN CO., a talc defendant, is a corporation incorporated in the State of Illinois, with its principal place of business in the State of Illinois and does business in the State of Indiana.

54.   The Defendant WALMART INC., a talc defendant, is a corporation incorporated in the State of Delaware, with its principal place of business in the State of Arkansas and does business in the State of Indiana.

55.   The Defendant YELLOW WOOD PARTNERS, LLC, a talc defendant, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in the State of Massachusetts and does business in the State of Indiana.

## II.    JURISDICTION AND VENUE

56.  This Court has jurisdiction over the parties pursuant to 28 USC §1332 because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and is between citizens of different states.

57.  This Court has personal jurisdiction over the Defendants because Plaintiffs' claims arise from Defendants' conduct in:

    (a)    doing any business in this state;

    (b)    causing personal injury or property damage by an act or omission done within this state;

    (c)    causing personal injury or property damage in this state by an occurrence, act or omission done outside this state if he regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue or benefit from goods, materials, or services used, consumed, or rendered in this state;

    (d)    having supplied or contracted to supply services rendered or to be rendered or goods or materials furnished or to be furnished in this state; and/or

    (e)    owning, using, or possessing any real property or an interest in real property within this state;

    (f)    In addition, a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States

58.  Plaintiffs' claims against the Product and Talc Defendants, as defined herein, arise out of Defendants' purposeful efforts to serve directly or indirectly the market for their asbestos and/or asbestos-containing products in this State, either through direct sales or through utilizing an established distribution channel with the expectation that their products would be purchased and/or used within Indiana.

59.  All of the named Defendants are corporations whose substantial and/or systematic business in Indiana caused injury to Plaintiffs in this State, which subjects them to the

jurisdiction of the Indiana courts pursuant to the Indiana Long-Arm Statute and the United States Constitution.

60.  Pursuant to 28 USC §1391(b)(2), venue is proper in this judicial district because a substantial part of the events or omissions occurred in Indiana.

### III.    STATEMENT OF CLAIMS

**A.    General Allegations**

61.  Decedent, Edward Jordan Winter, was diagnosed with malignant pleural mesothelioma on or about December 11, 2023.

62.  Asbestos caused Decedent's disease and subsequent death on May 1, 2024. Decedent was a resident of the State of Indiana from approximately 2008 to 2021 and was a resident of the State of Michigan at the time of his death.

63.  Mesothelioma is an incredibly painful, terminal and incurable disease. The latency period from Decedent's prolonged exposures to asbestos and/or asbestos-containing talc or talcum-powder products to his diagnosis of mesothelioma was over ten years. As such, Edward Jordan Winter's life expectancy was diminished following his diagnosis.

64.  Decedent's exposures to asbestos were the result of his personal use of asbestos-containing talcum powder products and through use by family members of various talc powder products and cosmetics which contained asbestos including, but not limited to Johnson & Johnson Baby Powder, Gold Bond Talc Powder, Dr. Scholl's Foot Powder, Lotrimin foot powder, AXE Body Talc, Polo Body Talc Powder, Chantilly body talc powder, CoverGirl cosmetics, Revlon cosmetics, L'Oréal cosmetics, Maybelline cosmetics, Mary Kay cosmetics, Estée Lauder talc powder and E.L.F. cosmetic products from approximately 1986 through 2023.

65.  From 1986 to 1993, Decedent's mother, Carole Winter, generously applied Johnson & Johnson Baby Powder in and on Edward Jordan Winter's hockey skates and equipment to control moisture and odor.

66.  From 1994 to 2023 Decedent was directly exposed to asbestos fibers from talcum powder through his continued use of Johnson & Johnson Baby Powder on his person and in his hockey skates and equipment. During these years Decedent also used Gold Bond Talc Powder, Lotrimin Foot Powder, Dr. Scholl's Foot Powder, Polo Body Talc, and AXE Body Talc on his person to control moisture and body odor.

67.  Decedent was further exposed to asbestos fibers from his birth in 1986 to 2001 through use by family members of asbestos-containing cosmetic talc products including but not limited to CoverGirl, Revlon, Chantilly, L'Oréal, Maybelline and Mary Kay by his mother and through use of Gold Bond foot powder Dr. Scholl's foot powder and Lotrimin foot powder by his father.

68.  Decedent was further exposed to asbestos fibers from 2009 to 2023 following his marriage to his wife Jennifer, through her continued use of asbestos-containing talcum powder products including, but not limited to CoverGirl, Revlon, Estée Lauder, E.L.F., L'Oréal and Maybelline cosmetic products.

69.  Decedent and his family members did not know of the dangers of asbestos or asbestos-containing products at the time he was exposed.

70.  Defendants had superior knowledge to Decedent and his family members about the dangers of asbestos or asbestos-containing products at the time he was exposed to asbestos fibers.

71.  Decedent's exposure to asbestos was reasonably foreseeable to Defendants.

72. The Defendants that manufactured, sold, and/or distributed asbestos-containing products for use in Indiana and other states at times relevant to this action are referred to herein as "Product" and/or "Talc" Defendants. At all times relevant to this action, the Defendants and the predecessors of the Defendants for whose actions the Defendants are legally responsible, were engaged in the manufacture, sale, and distribution of asbestos-containing products.

73. At all times herein mentioned, each of the named Defendants was an entity and/or the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, or division of an entity, hereinafter referred to collectively as "alternate entities," engaged in the business of researching, studying, manufacturing, fabricating, designing, modifying, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain product, namely asbestos talc products, other products containing asbestos, and products manufactured for foreseeable use with asbestos products.

74. At all times relevant herein the manufacture, assembly, sale, marketing, distribution, actions and/or inactions of Defendants in the State of Indiana caused Decedent to be exposed to respirable asbestos fibers while he was in the State of Indiana and/or other states. Such exposures caused and/or contributed to cause his malignant mesothelioma and subsequent death.

**B.    Allegations Applicable to All Talc Defendants**

75. Plaintiffs repeat, reiterate and re-allege every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

76. Talc Defendants, as identified herein, sold talc and/or talc-containing products to which Decedent was exposed.

77. Each Talc Defendant knew, or should have known through the exercise of reasonable care, of the association of talc with asbestos.

78. Consequently, each Talc Defendant was on notice that (a) its talc and/or talc-containing product(s) were likely to contain asbestos and (b) needed to regularly monitor its talc sources and products for asbestos content through the use of adequately sensitive/powerful methods.

79. Since 1898, mineralogy treatises recognized that asbestos is associated with, and often occurs as an accessory mineral to, talc. In 1898, Edward Dana's influential "Text-Book of Mineralogy" stated that "talc … is often associated with serpentine … and frequently contains crystals of … asbestos, actinolite …" Mineralogy and geology texts frequently and consistently reported this association throughout the twentieth century.

80. Before and during the time Talc Defendants sold the talc and/or talc-containing products Decedent was exposed to, each Talc Defendant knew the talc in their products contained asbestos. At the very least, each Talc Defendant should have known of the presence of asbestos in their products if they exercised reasonable care, including monitoring and testing their talc sources and products.

81. The talc and/or talc-containing products, used by Decedent and/or Decedent's family members, sold, manufactured marketed, and/or distributed by Talc Defendants, contained tremolite asbestos, actinolite asbestos, anthophyllite asbestos and/or chrysotile asbestos.

a. Talc sourced from the Fontane mine in Val Chisone, Italy (*e.g.*, Talc 1615, Supra) contains tremolite asbestos, actinolite asbestos, anthophyllite asbestos and/or chrysotile asbestos.

b. Talc sourced from southern Vermont talc mines, such as the Hammondsville, Argonaut and Hamm mines (*e.g.*, Windsor 66, Vertal C-O) contains tremolite asbestos, actinolite asbestos, anthophyllite asbestos and/or chrysotile asbestos.

c. Talc sourced from southwest Montana talc mines, including the Treasure, Regal, Beaverhead and Yellowstone mines, (*e.g.*, Talc 399, Talc 1745, Talc 2755, MP 50-30, MP 60-30, Olympic, Supreme) contains tremolite asbestos, actinolite asbestos, anthophyllite asbestos and/or chrysotile asbestos.

d. Talc sourced from the Guangxi and Liaoning regions in China (*e.g.*, Grade 25, Supra H) contains tremolite asbestos, actinolite asbestos, anthophyllite asbestos and/or chrysotile asbestos.

e. Talc from the Nancy Jordan mine in Murphy, North Carolina (*e.g.*, Talc 1, Talc 643, Talc 2450) contains tremolite asbestos, actinolite asbestos, anthophyllite asbestos and/or chrysotile asbestos.

82. Before and during the time Talc Defendants sold the talc and/or talc-containing products to which Decedent and/or his family members were exposed , each Talc Defendant knew, or should have known through the exercise of reasonable care, of publicly-available scientific literature and other information reporting asbestos minerals, fibrous tremolite/actinolite and/or asbestos in talc, including talc from Val Chisone, Italy (*e.g.*, the Fontane mine), southern Vermont (*e.g.*, Hammondsville, Argonaut and Hamm mines), southwest Montana (*e.g.*, Treasure, Regal, Beaverhead and Yellowstone mines) and China (*e.g.*, Guangxi and Liaoning regions).

83. Before and during the time Talc Defendants sold the talc and/or talc-containing products to which Decedent was exposed, each Talc Defendant knew, or should have known through the exercise of reasonable care, of publicly-available scientific literature and other information reporting asbestos minerals, fibrous tremolite/actinolite and/or asbestos in talc, including talc from Val Chisone, Italy (*e.g.*, the Fontane mine), southern Vermont (*e.g.*,

Hammondsville, Argonaut and Hamm mines), southwest Montana (*e.g.*, Treasure, Regal, Beaverhead and Yellowstone mines) and China (*e.g.*, Guangxi and Liaoning regions).

84.    The ordinary, foreseeable and/or intended uses of the talc-containing consumer products Decedent and/or his family members used include, but are not limited to, (a) shaking talc powder out of bottles for various applications to the body, (b) scraping a brush across a compacted powder and/or (c) applying a brush or "poof" to a loose powder product and then to the body or face. Such application methods inevitably result in airborne powder that enter the user's breathing zone and the surrounding area.

85.    Throughout the time Talc Defendants sold the talc and talc-containing products Decedent was exposed to, each Talc Defendant knew and intended that end users would use their products (and/or finished talcum powder products) in the above-identified ways. Consequently, as each Talc Defendant knew, if such talc contains asbestos fibers, the ordinary, foreseeable and/or intended uses of finished talcum powder products results in airborne asbestos fibers that users inevitably inhale.

86.    Because Talc Defendants knew, or should have known in the exercise of reasonable care, their talc-containing products contained asbestos, each Talc Defendant knew the intended uses of their products cause the release of significant concentrations of airborne asbestos fibers that users breathe during ordinary use.

87.    Inhalation of all asbestos types in all forms, including from asbestos-containing talc, can and does cause mesothelioma.

88.    Before and during the time Talc Defendants sold the talc and/or talc-containing products Decedent was exposed to, each Talc Defendant knew, or should have known through

the exercise of reasonable care, that breathing asbestos fibers can and does cause fatal diseases, including mesothelioma.

89. Throughout the time Talc Defendants sold talc and talc-containing products Decedent was exposed to, the hazards of asbestos were knowable and known in the scientific community.

   a. The capacity for asbestos to cause disease was first reported in the scientific literature in the 1890s.

   b. By the 1920s and 1930s, it was widely known in the scientific literature and generally accepted in the scientific community that asbestos exposure can cause asbestosis.

   c. In the 1940s, it was first reported that asbestos exposure can cause mesothelioma.

   d. By the early 1960s, it was widely known in the scientific literature that asbestos can cause mesothelioma.

   e. Numerous trade organizations, including organizations which the Talc Defendants were members of and participated in, regularly distributed information about the health hazards of exposure to asbestos.

   f. Throughout the 1930s to 1960s, numerous state governments and the federal government enacted regulations of asbestos in the workplace. Such regulations included exposure limits and making asbestos-related disease compensable under workers' compensation statutory schemes.

90. Before and during the time Talc Defendants sold the talc and/or talc-containing products Decedent was exposed to, each Talc Defendant knew, or should have known through the exercise of reasonable care, that relatively low cumulative doses of exposure to asbestos, including from inhaling asbestos-containing talc, can and does cause mesothelioma. Such information was known, knowable and publicly available.

   a. In the 1930s and 1940s, the scientific literature reported that threshold limit values do not protect against the development of cancers and it was generally accepted by the early 1970s.

b. Throughout the 1960s and 1970s, publicly-available scientific literature reported that mesothelioma can be caused by contact with the asbestos-laden clothing of family members.

c. By the 1970s, the scientific community generally accepted that relatively low, brief or intermittent exposures to asbestos can cause mesothelioma.

91. Before and during the time Talc Defendants sold the talc and/or talc-containing products Decedent was exposed to, each Talc Defendant knew, or should have known through the exercise of reasonable care, that ordinary end users like Decedent and/or his family (a) did not know that they were being exposed to asbestos from the use of their talc products and (b) asbestos is a carcinogenic substance that can cause fatal diseases, including mesothelioma.

92. Each Talc Defendant knew their products required asbestos labels and warnings about the danger of exposure to their asbestos-containing products.

93. Each Talc Defendant failed to place any labels, cautions or warnings on the talc and/or talc-containing products they marketed, sold, distributed or otherwise placed into the stream of commerce, that their product(s) contained asbestos fibers and can cause fatal diseases such as mesothelioma.

94. Each Talc Defendant failed to disclose the information known, received and/or available to them about the asbestos mineral content, fibrous tremolite/actinolite content, asbestos content and/or health dangers (*i.e.*, cancer, mesothelioma) from exposure to their products.

95. Before and during the time Talc Defendants sold the talc and/or talc-containing products Decedent was exposed to, each Talc Defendant knew, or should have known through the exercise of reasonable care, of cornstarch as a substitute for talc and (b) failed to develop, implement, replace and/or promote (in an expeditious manner) products using a safer alternative or substitute.

96.   Each Talc Defendant's negligent acts and/or omissions regarding asbestos testing included, but are not limited to, (a) failing to begin testing their products for the presence of asbestos until too late, (b) failing to test using adequately sensitive/powerful preparation techniques and/or test methods intended to detect asbestos if present, (c) failing to test with enough frequency to reasonably monitor their products' asbestos content and (d) applying false (or knowingly false) criteria for determining and reporting the presence of asbestos.

97.   Before and during the time Talc Defendants sold the talc and/or talc-containing products Decedent was exposed to, each Talc Defendant knew, or should have known through the exercise of reasonable care, of preparation techniques (*e.g*., heavy liquid density preconcentration techniques) and tools (*e.g*., transmission electron microscopy ["TEM"]) capable of detecting asbestos at relatively low bulk concentrations. Despite such knowledge, Talc Defendants chose not to use them and therefore knowingly ignored, tolerated and accepted the presence of asbestos in their products.

98.   Instead of using more sensitive/powerful preparation techniques and tools Talc Defendants knew or should have known about, each Talc Defendant knowingly devised schemes to (a) use methods that could not detect asbestos below certain bulk concentrations and, when not detected, (b) falsely equate a "non-detect" result with a "not present" or negative result.

99.   Based on "non-detect" results obtained from insensitive tools incapable of detecting asbestos below certain bulk concentrations, the Talc Defendants then knowingly mislead legislators, regulators and the public by presenting the results as "asbestos-free."

C.     **Allegations regarding Talc Defendants and the Cosmetic, Toiletry & Fragrance Associate (n/k/a Personal Care Products Counsil)**

100. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

101. For decades, all named Talc Defendants, directly and/or as successors-in-interest/alter egos, supplied, distributed, and/or manufactured products composed of talc that were sold and marketed as safe for daily use by consumers, like Decedent and/or his family members, on their person to give off a pleasant smell, mask odors, prevent chaffing and/or absorb moisture. Defendants' talcum powder products, were advertised as healthful for babies, children and adults and to be applied regularly to maintain freshness, keep skin soft, mask odors with a floral fragrance, prevent chaffing and/or absorb moisture.

102. Defendants and the Cosmetic, Toiletry & Fragrance Association (n/k/a Personal Care Products Council) ("CTFA") made false statements to Decedent and/or his family members, the general public, news media and government agencies that exercise regulatory authority over the cosmetic industry, including, but not limited to, the U.S. Food & Drug Administration ("FDA"), the National Institute of Occupational Health and Safety ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), the Mine Health and Safety Administration ("MHS"), and the National Toxicology Program ("NTP"), which, in turn, proximately caused exposed persons' harm through intentional efforts to deceive the general public as to the safety of and presence of carcinogens, including asbestos, in talc-containing products.

103. Defendants and CTFA, for decades before Decedent was born, possessed medical and scientific data that raised concerns regarding the presence of carcinogens, including

asbestos, in talc and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products.

104. Talc is a hydrous magnesium silicate, inorganic material that is mined from the earth. It is used in the manufacture of goods, such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in defendants' products, talc is known as "talcum powder."

105. Geologists, Defendants and CTFA—and their suppliers, experts, agents and advisors—have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. "Asbestos" is a commercial and legal term, rather than a geologic or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and amphibole minerals such as actinolite, anthophyllite, tremolite, amosite and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s, note the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

106. Defendants, some of which have been and still are the largest talc producers and/or talc-containing product manufactures in the world, admit that they have long employed and/or consulted with doctors, scientists, geologists, mineralogists and toxicologists, and that they have long maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of carcinogens, including asbestos, in talc and talc deposits.

107. Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being

carcinogenic, such as asbestos, silica, quartz, nickel and arsenic. Within the next several decades, an ever-growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer and death.

108. Defendants and their affiliates, employees, agents and/or suppliers were members of the National Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and 45% tremolite, and the National Safety Council stated, "The results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of National Safety News, an article entitled "No Halfway Measures in Dust Control" by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

109. In 1936, the National Safety Council published an article entitled "Lesser Known Facts About Occupational Diseases" that found "exposure to asbestos fibers, present in the

weaving and grinding of dry asbestos material, offers another type of dust which may cause fatalities among workers." In 1958, The New York Department of Labor published Industrial Code Rule No. 12 establishing regulations applying to all employees and employers relating to dangerous air contaminants and listing both asbestos and talc as such substances.

110. In 1968, a study presented at the American Industrial Hygiene Conference & Exposition and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley, et al., Fibrous and Mineral Content of Cosmetic Talcum Products, 29 Am. Ind. Hyg. Assoc. J. 350-354 (1968). Defendants were aware of these findings.

111. In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association. Defendants were aware of this study. The study revealed that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite and chrysotile. The study explained that such fibrous content was not unexpected because these types of fibers are often present in fibrous talc mineral deposits. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some talcum powders contained asbestos, there is no evidence that positive results or the brand names

of contaminated products were communicated to any governmental agency, the media or the public.

112. A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., Consumer Talcums and Powders: Mineral and Chemical Characterization, 2 J. Toxicol. Environ. Health 255-284 (1976). The Mount Sinai study results were published by various newspapers, including the New York Times and the Washington Post, and Defendants were aware of same.

113. In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on talc-containing products. Defendants and CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers (including asbestos hazards) associated with cosmetic talcum powder products, such as Defendants' products.

114. In 1971, the New York City of Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction ("XRD") analysis, and found them to contain 5-25% tremolite and anthophyllite asbestos.

115. Soon thereafter, a symposium was held in August of 1971 at the FDA to discuss the issue of asbestos content of talcum powders with the talc industry, government officials, and doctors and scientists from Mt. Sinai Hospital, which was then the epicenter of the medical

and scientific study of asbestos. Among other statements, participants and attendees heard: that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable way to determine the asbestos content of talc and talcum powder is through TEM and electron diffraction. Defendants and CTFA, aware of the foregoing and citing costs as well as their fear of the public learning talc was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test talc products to make sure they were free from asbestos and other carcinogens.

116. After this 1971 symposium, Dr. Weissler of the FDA hired Dr. Seymour Z. Lewin to test commercially available talcum powders for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer Inc. The results, however, were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy, and electron diffraction must be used to detect asbestos in talc and talcum powders.

117. Dr. Lewin of New York University disclosed twice in 1972 that asbestos had been found in cosmetic talc. In a report to the FDA on August 3, 1972, Dr. Lewin reported that of 195 talc products, 20 had tremolite, 7 had chrysotile, 9 had both tremolite and chrysotile, and 7 had substantial percentages of one of both. XRD had been used as the first step in analysis and the presence of asbestos and was verified by the use of optical microscopy to disclose the presence of significant numbers of fibers. Shortly thereafter, Dr. Lewin reported to Whittaker, Clark & Daniels Inc. on September 30, 1972, that Italian talc 1615 contained about 2% tremolite and 0.5% chrysotile as determined with XRD and detailed microscopic exam. In a July 31,

1973, review of Dr. Lewin's testing of 195 talc samples, the FDA found "good semi-quantitative agreement" for tremolite on selected samples re-analyzed using optical microscope analysis by FDA and XRD by Pfizer. Agreement was not as good for chrysotile, but the review did warn that optical microscopy could "completely miss the presence of chrysotile if the fibers are submicroscopic, which may well be the case in finely-milled talc." In 1972, ES Laboratories reported that "1615" talc contained 1% chrysotile and that "4615" talc contained 3% chrysotile and 3% anthophyllite. An August 23, 1973, report by Johns-Manville on TEM analysis of commercial talcs reported that nine of fourteen samples contained chrysotile. Only five samples did not have detectable levels of chrysotile. Pages from the laboratory notebook of Colgate-Palmolive Co. scientist Paul Briscese from March 7, 1976, show that Old Regal (North Carolina) talc tested positive for tremolite, New Montana talc tested positive for anthophyllite and tremolite, and Italian talc tested positive for tremolite.

118. A December 10, 1973, report of the CTFA's Talc Subcommittee disclosed that optical microscope analyses of talcs from the Italian, Montana I & II, Alabama, Vermont, and North Carolina mines had failed the proposed FDA's method because of elevated chrysotile concentrations. This December 10, 1973, CTFA report also showed that several laboratories had reported chrysotile in many of the talc samples sent by the CTFA for evaluation of analytical methods as well as the several identifications of asbestos in talc mentioned.

119. In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, including many of the Defendants herein, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such

as Defendants' products. On September 3, 1973, the FDA sent CTFA a letter regarding various means of measuring asbestos in talc, stating that "conventional methods employing X-ray diffraction or differential thermal analysis are not sufficiently reliable to produce quantitative results of the desired precision." The FDA further advised CTFA that it "has been exploring refractory optical microscopy as a means of measuring asbestos in talc." CTFA responded to the FDA's public notice on its proposed optical microscopy method on December 26, 1973. CTFA contended that the proposed method was not "reliable" for the detection of asbestos in talc, recommended a "collaborative effort between FDA and industry to develop such a method," and urged deferment of the proposed rule. Minutes of CTFA's Talc Subcommittee meeting on March 15, 1976, indicate that the FDA's "Dr. Shaffner suggested the possibility of having industry report periodically on the results of its analysis to the FDA." Dr. Estrin of CTFA responded that "the subcommittee would give serious consideration to this suggestion."

120. Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing and drugs to be completely free of asbestos. These were some of the same "grades" of talc used by Defendants.

121. The talc industry's response, including that of the defendants, was swift and well-coordinated through CTFA, with which the defendants conspired and worked in concert to purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos in talc and block efforts to label and warn consumers regarding the dangers associated with the talc products, including defendants' products.

122. Regarding the FDA's proposed 1972 rule-making, the FDA Director of Product Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a meeting in August of 1972 to discuss the results of Dr. Lewin's study and inform them that the FDA was preparing to release a "Proposed Statement of Policy On Asbestos in Cosmetics Containing Talc." Dr. Schaffner explained that he was duty-bound and must publicize the brand names of the talcum powders that contained asbestos. CTFA's president, Dr. Merritt, strongly objected to the FDA alerting the general public and publishing the brand names of the talcum powders, as it would cause the manufactures "economic hardship." Dr. Merritt also threatened to sue the FDA to prevent the disclosure of the brand names. As a result, the FDA, defendants and CTFA never revealed or publicized the brand names of the talcum powders that contained asbestos, much to the detriment of the Decedent and the general public.

123. In 1973, CTFA created a talc subcommittee and the Scientific Advisory Committee to develop a testing methodology for detecting asbestos in talc. Initially, CTFA designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated among the members, including representatives of defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including the spiked sample), and one found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not optical microscopy, but rather TEM and electron diffraction. The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction

equipment was too expensive, despite defendants then owning or having unfettered access to same.

124. From there, the difference between what defendants and CTFA knew diverged from what they were representing to the FDA. Defendants, CTFA and others in the industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos could not be detected using the prevailing, most economic analytical methodology, XRD, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%.

125. Defendants and the CTFA also did not disclose to the FDA that the overwhelming majority of talcum powder manufacturers and sellers were not testing their products for asbestos, and even if they were testing, it was done so superficially: only four or so grams per 20 tons of pre-shipment and pre-processed talc, as an example. Defendants and CTFA also failed to the inform the FDA that they were not testing off-the-shelf talc powder products, but rather old samples that were never from the end products themselves. They also failed to inform the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that are commonly found in talc deposits. What is more, to the extent defendants found asbestos in their samples, these positive results were not reported to the FDA. Instead, on their behalf, CTFA sent letters to the FDA in March of 1976 untruthfully claiming that industry testing had shown all talcum powder products to be completely free of asbestos.

126. Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt. Sinai School of Medicine, and the FDA became increasingly concerned that CTFA, defendants and the cosmetic industries were slow to address the issue of asbestos in talc and talcum

powders. Defendants had not issued any recalls, provided consumer warnings, informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, or developed a reliable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos.

127. Taking matters into their own hands, Mt. Sinai Hospital researchers published a follow-up article to Dr. Lewin's 1971 study that demonstrated that some of defendants' talcum powders contained over 20% asbestos. The researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." The results of the Mount Sinai study were known to the defendants and published the same year by the New York Times and the Washington Post.

128. Defendants and CTFA responded to these developments by falsely claiming that the industry was doing "everything" it could to solve the problem; issuing press releases falsely claiming that chrysotile had never been found in talcum powders; and intentionally suppressing data that showed tremolite was commonly found in talc and talcum powder.

129. CTFA subsequently began in earnest to produce a voluntary protocol and methodology that would provide defendants cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder contained asbestos, defendants and CTFA falsely represented that talcum powders have never contained asbestos.

130. Defendants and third parties collectively met with and corresponded with CTFA, as well as collectively met with the FDA and other government agencies, to individually and

collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of talc to be used in consumer products. Defendants' "voluntary" method—that was developed collectively by defendants and CTFA and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of the testing methods. Defendants and CTFA also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as those to which Decedent was exposed.

131. In support of its voluntary XRD methodology, which was finally published in 1977, CTFA produced letters to the FDA written by its members, including defendants, identifying tests conducted showing talcum powder products did not contain asbestos. CTFA, defendants and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens.

132. CTFA "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published method, rather, relies on XRD with "the level of detection of amphibole by this method [being] 0.5% and above." CTFA met with and corresponded with defendants and third parties, to individually and collectively advocate to the FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by TEM. This voluntary method was developed by CTFA and defendants, and was advocated to the FDA by CTFA and defendants in lieu of regulations requiring labeling and warnings on talcum powder products, even though CTFA and defendants knew that the J4-1 method would not reveal the

true level of asbestos in the talc that reached consumers. In fact, the first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the CTFA's own J4-1 method. There is no evidence that CTFA or defendants ever shared this remarkable failure with the FDA or the public.

133. Minutes of CTFA's Talc Subcommittee from February 24, 1975, stated "It was agreed, however, that chrysotile is never found in cosmetic talcs, based on numerous analyses by several investigators…" When referring to the challenge of chrysotile detection, an article entitled "Talc" in the January/March 1976 CTFA Cosmetic Journal, states that "The only known backup method for a positive identification in this event, is [TEM] with selected area diffraction." However, "despite many efforts, the committee had been unable to find a sample of cosmetic talc containing naturally occurring asbestos…it was asked, 'Why should we test for chrysotile if there isn't any?'" CTFA's Specification for Cosmetic Talc, revised on October 7, 1976, falsely represented that no fibrous asbestos was detected in cosmetic talc. Even after 1976, CTFA and defendants continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos and other carcinogens in the talc being used to manufacture cosmetic products. However, CFTA and defendants continued to represent that no asbestos was detected in cosmetic talc. These material representations adversely and directly impacted the FDA's attempt to adequately test consumer talc for asbestos and regulate cosmetics. The most sensitive method of identifying or detecting asbestos in cosmetic talc, TEM-SAED, was not used because CTFA represented that its "ultra-sensitivity could be a problem" and that it was too expensive to use. Instead, its J4-1 method relied on

XRD alone for detection of asbestos at greater concentrations than 0.5%, a concentration that could allow more than a billion asbestos fibers per gram of talc to be passed off as "asbestos-free."

134. Defendants and CTFA made and published such representations, claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers was "safe," despite having substantial knowledge and evidence to the contrary. Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their products, and thereby inform the public, including Decedent and/or his family members, that talc-containing products contained asbestos.

135. CTFA then published an article in 1979 stating it conducted over three thousand tests of talcum powders and none of them found chrysotile. The article and report failed to disclose whether the talcum powders tested contained tremolite, anthophyllite or any other form of asbestos. This publication of half-truths was conveyed to the FDA and the public with the purpose of preventing regulations of cosmetic products. Thereafter CTFA's methodology became the standard by which nearly all talc was analyzed by the entire industry, including talc used in cosmetic and hygiene products today.

136. CTFA and defendants have represented to various news media outlets and the public at large that their products are "asbestos-free," when, in fact, their products did test positive for asbestos and those that did not were merely the result of inadequate and imprecise testing methods. "No asbestos detected" does not mean the product does not contain asbestos, but due to defendants' repeated conflation of the terms, the public has been led to erroneously believe talc products are safe. Furthermore, since defendants and CTFA did not have sufficient

testing protocols in place to support the claims that talc products were safe or asbestos-free, such statements were recklessly made, as they had no reason to believe them.

137. Between 1970 and the 1990s, tests conducted by and on behalf of defendants and the talc industry continued to show that talc and talcum powder products contained asbestos. None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of their existence is only because of civil litigation.

138. Defendants and CTFA's failure to disclose these positive results and the inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, even when various government agencies raised concerns about the safety of talc, including the issue of asbestos content.

139. To this day, many talc-containing products presently on the market contain asbestos. Instead of publicizing this fact, defendants and CTFA continue to deny all the above to protect their pecuniary interests, to the severe detriment of the public, including Decedent.

140. Since at least 1979, defendants have conducted a campaign to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are, therefore, safe. Nothing could be further from the truth: the FDA has never been assigned a budget by Congress to regulate cosmetics, including asbestos and other carcinogens in talcum powders. Defendants' concerns for the safety of their products have always been voluntary and under the auspices of CTFA, a private industry group, that in its 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States. Indeed, as of today, asbestos-containing talc in cosmetics has not been banned or otherwise regulated by CTFA or the FDA.

141. Defendants (and other entities in the talc industry and cosmetic industries, including the CTFA), individually and collectively, failed to report to the FDA tests performed both internally and by outside laboratories confirming the presence of asbestos in both their finished products as well as talc shipments from Talc Supplier Defendants and other sources that were used to produce finished products.

142. Defendants, and even the outside laboratories, including McCrone Associates, sent letters to CTFA, to be and which were forwarded to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphibole or chrysotile asbestos, when in fact all of these entities had received or performed tests indicating the contrary when such false representations were made.

143. After 1976, defendants and CTFA continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos in talc.

144. Defendants failed to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained carcinogens, including asbestos, at any point, up to and including the present, despite the clear hazard and direct information that their products did and continue to contain such carcinogens.

145. Defendants and CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to the public, including Decedent and/or his family members, regarding the hazards of exposure to carcinogens, including asbestos, from talc and talc-containing products.

146. Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including Decedent and/or his family members, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion of asbestos in their talc and talc-containing products.

147. Defendants and CTFA, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which Decedent was exposed.

148. Defendants and CTFA, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including Decedent and/or his family members, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

149. Defendants and CTFA conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior:

a. to withhold from users of their products—and from persons who they knew and should have known would be exposed thereto—information regarding the health risks of inhaling and/or ingesting asbestos and other carcinogens contained in talc and talcum powder products;

b. to eliminate, suppress or prevent investigation into the health hazards of exposure to asbestos and other carcinogens in talc and talcum powder products;

c. to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos and other carcinogens therein; and

d. to falsely represent that talc and talcum powder products, including those of defendants, were safe and healthful for use by consumers.

150. Exposed persons', including Decedent and/or his family members, reasonably and in good faith relied upon the false and deceitful representations made by Defendants named herein and CTFA regarding the hazards of talc and talcum powder products that contained asbestos and other carcinogens, and was, therefore, deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

151. CTFA, as well as Defendants and other entities in the talc industry and cosmetic industries, individually and collectively, failed to report to the FDA tests performed both internally and by outside laboratories confirming the presence of asbestos in defendants' and other CTFA members' finished products as well as talc shipments from talc suppliers and other sources that were used to produce finished products. Instead, CTFA sent letters to the FDA stating that results of testing of talc used by the industry after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such intentionally false misrepresentations were made. CTFA and defendants made and published such representations claiming that their collective testing method was adequate, they were ensuring that talcum powder products were safe, and that their testing of talc reaching consumers was "safe," despite knowing the contrary.

152. The FDA, and ultimately Decedent and/or his family members, directly and/or indirectly relied upon CTFA's and Defendants' false representations regarding the safety of cosmetic talc. For example, Decedent used and/or was exposed to talcum powder by family members (including without limitation those listed in above) regularly for decades because the Talc Defendants' false marketing statements made his and/or his family members believe their talcum powder products were safe to use on themselves and/or by Decedent himself. When in fact, an FDA letter dated January 11, 1979, states: "In cooperation with scientists from industry,

our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding CTFA's and defendants' misrepresentations was obvious seven years later. In a response to a citizen petition to require an asbestos warning label on cosmetic talc, on July 11, 1986, the FDA states that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole…" CTFA's J4-1 method, specifically advocated for by Johnson & Johnson for the benefit all named Talc Defendants named herein, has continued for the past four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc. The use of TEM, recognized by the CTFA as offering "greater sensitivity" for asbestos, continued to increase over the following decades as its advantages were applied to more matrices. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry, including defendants, continues, four decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

153. CTFA and defendants, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, marketing, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information available to the public regarding the hazards of exposure to asbestos and other carcinogens from talc and talc-containing products.

154. CTFA and defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including Decedent and/or his family members, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion of asbestos from their talc and talc-containing products.

155. CTFA and defendants, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which Decedent was exposed.

156. CTFA and defendants, through agreement and consciously parallel behavior, suppressed, altered, changed, destroyed and/or revised reports, data, tests, studies and other documents regarding the potential presence of asbestos and other carcinogens in talc and talc-containing products, including defendants' products to which Decedent was exposed.

157. As recently as 2016, Defendants made material misrepresentations to the FDA regarding asbestos in its talcum powder products.

158. For additional details regarding and supporting Plaintiffs' allegations, see Bird T., et al., "A Review of the Talc Industry's Influence on Federal Regulation and Scientific Standards for Asbestos In Talc," New Solut., 2021 Aug; 31(2): 152-169.

**D.    Successor Liability Allegations Applicable to Gold Bond Products and Related Defendants**

159. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

160. Arthur Guilford bought the Gold Bond powder formula from the Rhode Island State Medical Association in 1882. In 1908, he began mixing Gold Bond powder in his small Massachusetts' shop and selling it to New England consumers.

161. In 1912, Mr. Guilford sold the formula and manufacturing rights to John M. Chapman, who expanded distribution.

162. In 1930, Timothy Shea joined the company, then known as "The Gold Bond Sterilizing Powder Company." Mr. Shea went from a manager to the company's sole owner in 1965. The business continued operating out of Massachusetts, and the distribution continued to expand.

163. In 1930, Timothy Shea joined the company, then known as "The Gold Bond Sterilizing Powder Company." Mr. Shea went from a manager to the company's sole owner in 1965. The business continued operating out of Massachusetts, and the distribution continued to expand."

164. Mr. Garey, the President of GBPC, obtained the formula for each of the Gold Bond powder products from the original owners of Gold Bond powder products. He made no modifications or changes to that formula. The formula specified talc.

165. Mr. Garey identified Barretts Minerals, Inc. ("Barretts") and Charles B. Chrystal Company, Inc. ("CBC") as the suppliers for the talc he used to manufacture Gold Bond powder products.

166. In the late 1980s, CBC regularly sold anywhere from 20,000 to 42,000 pounds of Purtalc and/or Sugarloaf talc to GBPC.

167. On August 3, 1987, Block Drug Company, Inc. ("Block Drug") acquired the Gold Bond powder product line, and it continued manufacturing Gold Bond powder products using Sugarloaf talc supplied by CBC, and mined from Brazilian mines in Brumado Brazil.

168. In 1990, Block Drug sold the Gold Bond product line to Martin Himmel, Inc., however, per the agreement it continued to manufacture Gold Bond powder products for Martin Himmel, Inc. The talc used in MHI products came from Montana mines through Pfizer/Barretts.

169. According to the manufacturing agreement, Block Drug and GBPC agreed that it would continue manufacturing Gold Bond powder products at its Rhode Island plant on Block Drug's behalf, using Block Drug's specifications.

170. The parties also agreed that Block Drug would be responsible for ordering ingredients and component parts for Gold Bond powder products.

171. Per that agreement, GBPC remained liable for Gold Bond products manufactured by it for claims filed and noticed within one year of closing. For all product liability claims filed and noticed after that one-year period, Block Drug holds liability unless the claim arises out of GBPC's gross negligence or willful malfeasance.

172. In 1990, Block Drug sold the Gold Bond product line to Martin Himmel, Inc., (MHI) however, per the agreement it continued to manufacture Gold Bond powder products for Martin Himmel, Inc. as such, Block Drug remains liable for the time period Martin Himmel, Inc. owned the product line but it continued to engage in the manufacture of the Gold Bond Products.

173. Block Drug used talcs supplied by Charles B. Chrystal (CBC) or Whittaker, Clark and Daniels, sourced from Pfizer/Barretts' Montana mines or Brazilian mines. Block Drug used talc sourced from CBC.

174. CBC supplied "Sugarloaf talc and Purtalc to [Gold Bond Pharmaceutical Corporation] from 1986 to 1987 and Block Drug between 1989 and 1991." CBC was Block Drug's only supplier for Gold Bond during these years.

175. CBC's Sugarloaf talc is currently, and has historically been, sourced from Xilolite's talc mine in Brumado, Brazil. In 1989 alone, CBC supplied Block Drug with over 112,000 pounds of Sugarloaf talc. CBC's Purtalc was sourced from Montana mines. CBC

supplied Block Drug with 3,000 pounds of Purtalc in October 1989. That Purtalc shipment was sourced from Montana mines. Mr. Bodhan Prybyla, CBC's corporate representative, testified that the Purtalc supplied to Block Drug was sourced from Dillon, Montana, Barretts Minerals.

176. Pfizer owned and mined talc from the Treasure and Regal mines in southwest Montana from 1966 to 1992. Pfizer milled the talc in Barretts, Montana. In Pfizer's nomenclature, "MP" meant "Montana Platy" talc coming from these two Montana talc mines. Pfizer sold MP talc directly or through distributor WC&D. Pfizer stopped mining and selling talc in 1992. Barretts Minerals, Inc. ("BMI") continued Pfizer's talc operations after 1992.

177. Pfizer admitted that it sold "176 units of MP 50-30 to Block Drug in 1990 for $61,160."

178. The talcs used by Block Drug in Gold Bond powder products contained asbestos.

179. Chattem acquired the Gold Bond brand from MHI in 1996. Chattem continued to do the same business and operated in the same manner as MHI during the time it manufactured, produced and sold Gold Bond talc products. As such, Chattem remains liable for the time period Martin Himmel, Inc. owned the product line but it continued to engage in the manufacture of the Gold Bond Products.

180. Chattem was founded in 1879 as "The Chattanooga Medicine Company." It changed its name to "Chattem Drug & Chemical Company" in 1966. And in 1978, it changed its name to "Chattem, Inc."

181. Chattem was acquired by Sanofi-Aventis in 2010, making it a wholly owned subsidiary of Sanofi. Per Chattem's corporate representative Matthew Lochstampfor, Chattem "manufactures and markets" brand-name consumer health care products, including health and beauty products and cosmetics, sold to retail consumers.

182. From 1996 through 2021, Chattem made and sold talc-containing Gold Bond powder products (thereafter transitioning to making only cornstarch-based powder products) Chattem's Gold Bond powder products contained talc (a) sourced from the Treasure, Regal, and Yellowstone mines, (b) mined by BMI, (c) distributed by WC&D for some period of time after the acquisition from Martin Himmel (and thereinafter purchased directly) and (d) blended and incorporated into final products by PTI.

183. Chattem selected and used only PTI to make Gold Bond throughout 1996 to 2021. Although PTI manufactured Gold Bond, Chattem admits that it (a) controlled the formulation of the Gold Bond product, (b) told the contract manufacturer how to make it, (c) controlled what the package looked like, (d) told the package manufacturer how to make it and (e) ultimately, Gold Bond is Chattem's product.

184. Chattem admits that from 1996 to 2012, BMI supplied PTI with the talc to make Gold Bond. Paul Eicholz, head of PTI, stated PTI used the talc grade USP Microtalc MP 60-30 from BMI to manufacture in Gold Bond. PTI stated its MP 60-30 came from BMI's mines in Montana. Chattem admits the source mines of the talc used in Gold Bond during this period were BMI's Treasure and Regal mines. Treasure and Regal are single mines. BMI admitted that MP 60-30 came from its Treasure and/or Regal mines.  These mines contained asbestos talc.

185. Chattem agrees that WC&D distributed BMI talc to MHI and Chattem. Sales records show WC&D consistently sold MP 60-30 to PTI in Union, Missouri throughout 1996 to 1999. They also show WC&D sold MP 60-30 (and some Talc 141) to Chattem in 1996 to 1998. Chattem recognizes that WC&D assigned the product number Talc 1745 for MP 60-30.

**E.    Successor Liability Allegations Applicable to IMI Fabi (USA), IMI Fabi, LLC and IMI Fabi (Diana) ("FABI USA Defendants")**

186. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

187. Plaintiffs herein refers to (a) "Fabi Group" as the collective IMI Fabi entities identified below (or entities otherwise owned by identified below) and (b) "Fabi USA Defendants" as the defendants IMI Fabi (USA), Inc., IMI Fabi, LLC and IMI Fabi (Diana), LLC (each as a collective term). Fabi Group mines, processes, designs, markets and sells talc sourced from Italy, Australia, China, Pakistan and Brazil to customers all over the world.

   a. Fabi Group began in the 1950s when Corrado Fabi's father established Industria Mineraria Italiana S.r.l. ("IMI Fabi S.r.l."). Its name changed to IMI Fabi S.p.a. years later.

   b. IMI Fabi S.p.a. mines talc from multiple mines near Sondrio and Sardinia, Italy.

   c. It processes the talc at a facility near Sondria, Italy. In Polstalesio, Italy, IMI Fabi S.p.a. processes talc imported from China and Mt. Seabrook, Australia.

   d. IMI Fabi S.p.a. maintains business addresses in Milan, Italy and a quality assurance laboratory in Polstalesio, Italy.

   e. In about 1996, IMI Fabi S.p.a. entered a joint venture (50% ownership) with Unimin Talc Pty Ltd. to mine and process talc from Mt. Seabrook, Australia.

   f. Talc sourced from the Mt. Seabrook, Australian mine was marketed under the HiTalc brand name. In 2011, IMI Fabi (Australia) Pty. Ltd. acquired the remaining interest.

   g. In about the mid-1990s, IMI Fabi S.p.a. (Corrado Fabi) partnered with Dr. Wilhelm Schober of Austria to form HiPro Trading GmbH and HiTalc Marketing and Technology GmbH. HiTalc Marketing and Technology provided processing technology and marketing expertise the Fabi Group. HiPro Trading served as an export organization for Fabi Group entities.

   h. As described in greater detail below, in 1998, IMI Fabi S.p.a. (formerly IMI Fabi S.r.l.) attained a 40% interest in Zemex Fabi Benwood, LLC to process and market its Australian at a plant in Benwood, West Virginia.

   i. Through a series of transactions culminating in 2001, the "Fabi USA Defendants" formed with full ownership of the West Virginia site and former Clark/Suzorite site in New York.

188. The origins of the West Virginia and New York talc facilities begin before the Fabi USA Defendants were formally created in 1999 to 2001.

    a.  WC&D created a subsidiary, Clark Minerals, Inc. ("Clark") that processed talc near Natural Bridge (Diana), New York, including ore from Montana, North Carolina, Australia, South Korea and China. In 1981-1994, WC&D sold such talc as grades 141, 643, 1623, 1625, 1626, 1629, 3355.

    b.  In December 1994, WC&D sold Clark to Suzorite Mineral Products, Inc. ("Suzorite"), a subsidiary of Zemex Corporation. Suzorite purchased all of Clark's assets, including property, business contracts and trade names.

    c.  After December 1994, Suzorite continued the same business operations of Clark, processing talc from the same sources to make the same talc grades for sale to the same customers. COAs and other correspondence referred to Suzorite as the "Clark Plant." From December 1994 to March 1998, Suzorite entered distribution contracts with WC&D.

    d.  In 1995, Suzorite acquired Benwood Limestone Co. in West Virginia and constructed a talc processing facility there.

    e.  Zemex Fabi Benwood, LLC was created in North Carolina in December 1997. Suzorite was its sole member.

    f.  From January 1998 to March 2001, Suzorite owned 60% of Zemex Fabi Benwood, LLC. IMI Fabi S.r.l. owned the other 40%.

    g.  Zemex Fabi-Benwood, LLC consisted of three Suzorite managers and two IMI Fabi S.r.l. managers (Corrado Fabi, Dr. Wilhelm Schober).

    h.  Under the Zemex Fabi Benwood, LLC operating agreement, Suzorite managed the West Virginia plant. Zemex Industrial Minerals, Inc., a subsidiary of Zemex Corp., provided loans. IMI Fabi S.r.l. provided (a) access to the talc source (its Mt. Seabrook, Australian ore) and (b) product development and technical support (Dr. Wilhelm Schober).

    i.  On April 1, 1998, Suzorite (and/or Zemex Industrial Minerals) entered a Distributor Agreement with Cosmetic Specialties, Inc. ("CSI") for CSI to sell talc from the New York plant to the cosmetic industry.

    j.  Suzorite sought CSI after its contract ended with WC&D. Ronald Grexa, president of CSI, worked in technical sales of talc since 1970.

189. By April 2001, "Fabi USA Defendants" owned and operated talc operations in based in Benwood, West Virginia and Natural Bridge (Diana), New York.

a. IMI Fabi (USA), Inc. incorporated in Delaware on January 26, 1999.

b. On January 23, 2001, "ZFB-1, LLC" and "ZFB-2, LLC" formed in North Carolina. Suzorite was the sole member/owner of both entities (per corrected filings on March 7, 2001).

c. In March 2001, Suzorite conveyed (a) the tangible and intangible assets associated with the Natural Bridge (Diana), New York real property and talc processing facility to ZFB-1, LLC and (b) its ownership interest (100%) in ZFB-1, LLC to Zemex Fabi Benwood, LLC.

d. In March 2001, Zemex Industrial Minerals, Inc. conveyed its (or Suzorite's) Distributor Agreement with Cosmetic Specialties, Inc. ("CSI").

e. In March 2001, Suzorite conveyed (a) the Benwood, West Virginia real property to ZFB-2, LLC and (b) its ownership interest (100%) in ZFB-2, LLC to Zemex Fabi Benwood, LLC.

f. Thus, by March 2001, Zemex Fabi Benwood, LLC owned the property and other assets associated with the Nautral Bridge (Diana), New York (ZFB-1, LLC) and Benwood, West Virginia (ZFB-2, LLC) talc operations.

g. On March 23, 2001, Suzorite assigned its 60% ownership interest in Zemex Fabi Benwood, LLC to IMI Fabi (USA), Inc.

h. Thus, by the March 23, 2001, Suzorite no longer held any ownership interest in Zemex Fabi Benwood, LLC. IMI Fabi (U.S.A.), Inc. owned 60% and IMI Fabi S.p.a. owned 40% (obtained in 1998, per above).

i. On April 6, 2001, ZFB-1, LLC changed its name to IMI Fabi (Diana), LLC. It listed IMI Fabi, LLC as its sole member/owner.

j. On April 6, 2001, Zemex Fabi-Benwood, LLC changed its name to "IMI Fabi, LLC."

k. In the April 6, 2001 filing, IMI Fabi, LLC (f/k/a Zemex Fabi Benwood, LLC) listed its sole member/owner as IMI Fabi (USA), Inc. (with Corrado Fabi as president). However, per the 1998 transactions described above, IMI Fabi S.p.a. owned 40% of IMI Fabi, LLC.

190. Before and after the April 2001 transactions, the Natural Bridge (Diana), New York and Benwood, West Virginia talc operations continued uninterrupted.

a. After April 2001, the "Fabi USA Defendants" facility in Natural Bridge (Diana), New York processed primarily imported Chinese talc ore (including the Liaoning and Guangxi regions).

b. After April 2001, "Fabi USA Defendants" continued selling talc under the same product numbers as Suzorite and Clark, including talc grades or product numbers 141, 643, 1623, 1625, 1626, 1629, 1656, 3355.

c. The Benwood, West Virginia plant operated by IMI Fabi, LLC continued processing Australian talc ore and selling talc for industrial applications.

d. After April 2001, the Fabi USA Defendants continued their contractual relationship with CSI as its sales agent and representative. CSI acted as a (a) sales commission distributor and (b) stocking distributor.

e. Acting on behalf of the Fabi USA Defendants, CSI (a) interacted with the cosmetic and personal care industry to gain information about prospective customers (product manufacturers), including their talc suppliers, ore sources of talc and brand names they used, the specific properties of such talc and the prices charged, (b) evaluated set off talc products that the Fabi USA Defendants sold, (c) contacted prospective customers, (d) introduced the Fabi USA Defendants' talc products as set offs and (e) provided technical data sheets, talc samples and other information requested by the purchasing, quality control, etc. departments of the product manufacturer. The Fabi USA Defendants participated in each part of the above-described process, maintaining a continuous dialogue with CSI and, at times, making direct contact with product manufacturers.

f. Through at least early 2023, IMI Fabi, LLC and IMI Fabi (Diana), LLC both remained active, ongoing concerns.

g. Limited liability company annual reports submitted by IMI Fabi (Diana), LLC in North Carolina continued to refer to its business purpose as processing and manufacturing talc.

h. Directly and through distributors/sales agents, IMI Fabi (Diana), LLC and IMI Fabi, LLC sold talc throughout the United States, including in Indiana.

i. Fabi Group, including the Fabi USA Defendants, became one of the leading talc suppliers in North America.

191. The Fabi USA Defendants (a) sold directly to large-scale product manufacturers and (b) made purposeful efforts to enter distribution agreements with distributors (including, but not limited to, CSI) to promote and sell the Fabi USA Defendants' talc to large-scale product manufacturers that incorporated the Fabi USA Defendants' talc into finished products that were marketed and sold nationally, including in Indiana.

a.  The Fabi USA Defendants contracted with CSI because of CSI's customer contacts and experience. The Fabi USA Defendants gave CSI express and implied authority to act on their behalf.

b.  To gain new accounts/customers for the Fabi USA Defendants, CSI (a) interacted with the personal care industry to gain information about prospective customers' suppliers and needs, (b) evaluated set off talc products, (c) contacted prospective customers, (d) introduced the Fabi USA Defendants' talc products as set offs, (e) provided technical data sheets, talc samples and other information (*e.g.*, questionnaires) requested by the purchasing, quality control, etc. departments of the product manufacturers and (f) negotiated the price, delivery terms, etc.

c.  The Fabi USA Defendants participated in each part of the above process to gain new customers/accounts. They maintained a continuous dialogue with CSI and, at times, product manufacturers directly.

d.  After the Fabi USA Defendants obtained a new account, they maintained contact with such finished product manufacturers, including (a) receiving and signing purchase orders stating the talc's destination, (b) directly sending (*e.g.*, by fax) the product manufacturers signed purchase orders and certifications that the lot satisfied performance specifications, (c) marked individual talc bags according to the large-scale product manufacturers' specifications, including providing part numbers (*e.g.*, 802980 for Imifabi 141 to Procter & Gamble) and code name(s) (*e.g.*, "Arbit 098061" for Imifabi 141 to Revlon) and (d) arranged pallets per their specifications (*e.g.*, a placard "For Revlon").

e.  Fabi USA Defendants promoted talc grades for specific product types.

f.  Fabi Group, including the Fabi USA Defendants, (a) joined and participated in international industry trade organizations (*e.g.*, the Industrial Minerals Association), (b) spoke at conferences s (*e.g.*, Dr. Shober) and (c) attended trade conferences (*e.g.*, Cosmetics Global). Fabi USA Defendants remained informed about the talc market.

192. The Fabi USA Defendants, each directly and through distributors, sold talc that was incorporated in finished products that Decedent and/or Decedent's family purchased and used in Indiana.

a.  Throughout at least 2001 to the 2010s, the entities making CoverGirl products (Noxell, Procter & Gamble ["Noxell/P&G"]) consistently purchased substantial quantities of Fabi USA Defendants talc products that Decedent and/or Decedent's family purchased and used in Indiana.

b.  Throughout at least 2001 to the 2010s, Revlon consistently purchased substantial quantities of talc sourced from of Fabi USA Defendants, including at Revlon's

manufacturing sites in North Carolina and Arizona for use in Revlon's cosmetic talc products Decedent and/or Decedent's family purchased and used in Indiana.

193. Throughout the 2000s, the Fabi USA Defendants sent talc samples to E.S. Laboratories in Campobello, South Carolina for analysis of their asbestos mineral and asbestos content.

194. IMI Fabi, LLC (parent) can be held responsible as the "alter ego" of IMI Fabi (Diana), LLC (subsidiary). Likewise, IMI Fabi (USA), Inc. (parent) can be held responsible as the "alter ego" of IMI Fabi, LLC and IMI Fabi (Diana), LLC (subsidiaries). The Fabi USA Defendants (as part of the broader Fabi Group) operated as a single or common business enterprise that regularly intermingled the assets and personnel of the entities.

   a. Since their formal creation between January 1999 to April 2001, the Fabi USA Defendants have shared the same (or substantially the same) common ownership as vertically integrated within the Fabi Group.

   b. In public filings since their inception in 2001, both IMI Fabi (USA), Inc. and IMI Fabi, LLC identified Corrado Fabi as the President.

   c. Corrado Fabi served as President and/or CEO of IMI Fabi S.p.a. and all (or substantially all) of the Fabi Group entities.

   d. From about 2001-2002 to 2014, both IMI Fabi, LLC and IMI Fabi (Diana), LLC identified Scott Baker as the "manager" for both entities.

   e. In public filings from about mid-2001 to about 2015, both IMI Fabi, LLC and IMI Fabi (Diana), LLC listed their principal business address as Second & Marshall Street, Benwood, West Virginia. Thereafter, both entities identified 209 Marshall Street, Benwood, West Virginia.

   f. Beginning in about mid-2001, talc Purchase Orders with IMI Fabi (Diana), LLC provided the vendor address at Second & Marshall Street, Benwood, West Virginia (the same address used by IMI Fabi, LLC).

   g. Beginning in late 2001, IMI Fabi, LLC and IMI Fabi (Diana), LLC listed the same registered agents at the same locations.

   h. Fabi Group entities, including the Fabi USA Defendants, frequently shared common employees. Employees of one entity rendered services on behalf of (or for the benefit of) another entity. IMI Fabi, LLC and IMI Fabi (Diana), LLC always

(or almost always) provided the same phone numbers for customer service, quality assurance and sales.

i.  The Fabi Group entities were inter-related and co-dependent.

j.  IMI Fabi (USA), Inc. generated no business revenue and conducted no business. No separate corporate records exist, including (but not limited to) minutes, ledgers, profit-and-loss statements and check registers.

k.  Fabi Group entities, including the Fabi USA Defendants, used the same logo. The logo consists of "IMIFABI" in capital letters with an oval surrounding it. Fabi Group members receive detailed instructions on the logo's appearance's shape, colors, sizes and fonts.

l.  Reflecting common control, at any given time period, the COAs and MSDS regularly used by IMI Fabi S.p.a., IMI Fabi, LLC and IMI Fabi (Diana), LLC shared (substantially) the same form and format.

m.  IMI Fabi S.p.a. exerted pervasive control over policies regarding asbestos in talc in the Fabi Group entities, including the Fabi USA Defendants.

n.  The Fabi USA Defendants failed to observe their separate legal status, even in public filings.

o.  IMI Fabi (Diana), LLC failed to observe corporate formalities.

p.  Other persons and entities that interacted with Fabi Group regarded it as a single business enterprise.

195. The Fabi USA Defendants can be held liable for the conduct of, and talc sold by, Suzorite and/or Zemex Industrial Minerals, Inc. (referred to collectively as "Suzorite") in 1994-2001. The Fabi USA Defendants' liability as successors-in-interest to those entities include that the Fabi USA Defendants are the (a) "mere continuation" of Suzorite, (b) result of a "de facto merger" and (c) manufacturers, marketers and suppliers of the same product line(s):

a.  Suzorite's talc operations from the Natural Bridge (Diana) continued uninterrupted following the March/April 2001 transactions.

b.  After the March/April 2001 transactions, the Fabi USA Defendants held themselves out as the continuation of Suzorite. The Fabi USA Defendants referred to the New York site in submissions to regulatory agencies as "formerly known as Suzorite Minerals Products, Inc." An IMI Fabi (Diana), LLC MSDS from April 2001 (a) referred to its products collectively as "Clark Talc" and (b) identified the "previous issue" of the MSDS as from November 2000 (before IMI Fabi (Diana), LLC

existed). After the March/April 2001 transactions, Suzorite and the Fabi USA Defendants used the same COA, MSDS and correspondence format.

c. Suzorite and the Fabi USA Defendants maintained continuity in management and employees. Scott Baker and Michael Brown frequently signed Suzorite correspondence as "Plant Manager." After the March/April 2001 transactions, Michael Brown continued signing COAs, MSDS, etc. as "Plant Manager" for IMI Fabi (Diana), LLC. In annual reports, Scott Baker signed as "Manager" of IMI Fabi (Diana), LLC.

d. The Fabi USA Defendants operated from the same locations. Before and after the March/April 2001 transactions, they used addresses at (a) P.O. Box 398, Natural Bridge, NY, (b) Rt. #3 & Old Harrisville Road, Natural Bridge, NY, (c) Charlotte, NC and (d) Second & Marshall Street, Benwood, WV. The phone numbers remained the same.

e. Before and after the March/April 2001 transactions, Suzorite and the Fabi USA Defendants maintained the same day-to-day operations. The Fabi USA Defendants maintained business contracts (*e.g.*, consulting agreements, letter agreements) to ensure continuity of business operations. The Fabi USA Defendants continued the same distributor agreements in West Virginia and the same sales agent (CSI) for New York.

f. The Fabi USA Defendants continued selling the same product lines as Suzorite, including product numbers as 140, 141, 643, 1623, 1625, 1626, 1629 and 3355. Acting as the sales agent of the Fabi USA Defendants, CSI wrote Revlon in May 2003 to compare old product names (*e.g.*, "Suzorite 141 B.C.") to the new product names (*e.g.*, "Imifabi 141 B.C.") for then-active Revlon internal codes (*e.g.*, "Arbit").

196. Fabi Group, including the Fabi USA Defendants (a) possessed actual knowledge that the talc it sold (which became incorporated in products that Decedent and/or Decedent's family used in Indiana) contained asbestos, (b) knew that inhaling such asbestos can mesothelioma and (c) failed to warn.

197. Formal and informal discovery has also shown that the FABI USA Defendants are responsible as alter-egos of each other in addition to successors-in-interest to Suzorite/Zamex under Indiana law.

**F.    Successor Liability and/or Piercing the Corporate Veil Allegations Applicable to All Johnson & Johnson Defendants**

198. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

199. From the 1890s to December 1978, defendant Johnson & Johnson alone designed, manufactured, marketed, distributed, and sold talc-containing Johnson's Baby Powder in the United States, including in Indiana where Decedent and/or his family members were exposed to their products.

   a. Johnson & Johnson was incorporated in 1887 and began selling Johnson's® Baby Powder in 1894, launching its baby care line of products.

   b. In 1965, Johnson & Johnson acquired Eastern Magnesia Talc Co. and changed its name to Windsor Minerals, Inc. ("WMI") in September 1967.  WMI mined and processed the Vermont talc incorporated in Johnson's Baby Powder and other products from 1967 to January 1989.

   c. In 1972, Johnson & Johnson established a formal operating division for its baby products business. Johnson & Johnson transferred its assets associated with the baby products division to Johnson & Johnson Baby Products. It remained a division (*not* subsidiary) through December 1978.

200. From January 1979 to October 12, 2021, "Old JJCI" (Johnson & Johnson Consumer, Inc. and its predecessors) claimed to have designed, manufactured, marketed, distributed, and sold talc-containing Johnson's Baby Powder, including in Indiana, where Decedent and/or Decedent's family purchased and used their products.

   a. In January 1979, Johnson & Johnson transferred all the assets associated with its baby products division to Johnson & Johnson Baby Products.

   b. In 1981, Johnson & Johnson Baby Products transferred (non-diaper) assets and liabilities to its subsidiary Omni Education Corporation ("Omni"). Immediately thereafter, Johnson & Johnson Baby Products merged into another subsidiary and was renamed Personal Products Company. Omni changed its name to Johnson & Johnson Baby Products Company.

   c. In 1988, Johnson & Johnson Baby Products Company transferred the assets and liabilities of its baby products business to Johnson & Johnson Dental Products, renamed Johnson & Johnson Consumer Products, Inc.

   d. In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson & Johnson Consumer Companies, Inc.

e.  In 2015, J&J Consumer Companies merged into an affiliate that merged into McNeil-PPC, Inc., then renamed Johnson & Johnson Consumer Inc.

f.  "Old JJCI" was the wholly-owned subsidiary of Johnson & Johnson throughout January 1979 to October 2021.

201. In October 2021, Johnson & Johnson devised and implemented a plan called "Project Plato" with the objective and specific purpose of eliminating (or substantially reducing) liability for injuries caused by the use of its talc products.

a.  On October 12, 2021, Johnson & Johnson split Old JJCI through a divisional merger (known as the "Texas Two Step") into two entities that ultimately went by the names of (1) LTL Management, LLC (which subsequently changed its name to LLT Management, LLC in approximately December 2023) and (2) Johnson & Johnson Consumer Inc. ("New JJCI" or "New JJCI/Holdco"). Old JJCI ceased to exist.

b.  "LTL" stood for "Legacy Talc Liabilities.".

c.  LTL Management, LLC never held any productive business assets, never made any products, never conducted any business, never operated any facilities and never served any productive business purpose. It merely received *de minimus* revenue streams.

d.  Johnson & Johnson caused the October 12, 2021, transactions ("Project Plato") with the intent to place all of the talc liabilities into LTL Management, LLC for it to then immediately declare Chapter 11 bankruptcy.

e.  Per Johnson & Johnson's plan and design, once LTL declared Chapter 11 bankruptcy, Johnson & Johnson and LTL sought the protection of the Bankruptcy Code's processes to (a) stay all pending litigation and (b) force an aggregate resolution of present and future talc/asbestos liabilities that would foreclose jury trials and reduce compensation owed.

f.  Per the sworn testimony of Johnson & Johnson and Kenvue executives, the purpose and intent of Project Plato was to create an entity (LTL Management, LLC) to "allocate talc liabilities" and "stop litigation completely."

g.  An October 5, 2021, internal Johnson & Johnson e-mails expressed the purpose of Project Plato was to ensure the talc liabilities would have "no impact on the Enterprise" (the "Enterprise" was internal lingo for Johnson & Johnson, the parent entity).

202. On October 12, 2021, the assets and productive business of Old JJCI (a New Jersey corporation headquartered in New Jersey) were transferred to Johnson & Johnson Consumer Inc. ("New JJCI" or "New JJCI/Holdco") (a New Jersey corporation headquartered in New Jersey). The transfer occurred within the span of a few hours through multiple newly-created companies that no longer exist. The transfer occurred without anyone setting foot or conducting any productive business in Texas. Johnson & Johnson caused the following to occur on October 12, 2021, to effectuate Project Plato.

a.  Janssen Pharmaceuticals, Inc. (a subsidiary headquartered in New Jersey) created Currahee Holding Company (a New Jersey corporation).

b.  Janssen Pharmaceuticals, Inc. transferred Old JJCI to the newly-created Currahee Holding Company.

c.  Old JJCI merged into Chenango Zero LLC, a newly-created Texas limited liability company.

d.  Chenango Zero underwent a divisional merger into Chenango One, LLC and Chenango Two, LLC, both newly-created Texas limited liability companies.

e.  Chenango One immediately converted to a North Carolina limited liability company and changed its name to LTL Management, LLC.

f.  Chenango Two immediately merged back into Currahee Holding Company and converted to New JJCI (a New Jersey corporation headquartered in New Jersey).

g.  Michelle Goodridge was the president of Old JJCI, Currahee Holding, Chenango Zero, Chenango One, Chenango Two and New JJCI.

h.  At the conclusion of these transactions, substantially all of the assets of Old JJCI (including those related to manufacturing, marketing and selling Johnson's Baby Powder) were transferred to New JJCI. Old JJCI ceased to exist.

i.  Subsequently, on or around December 16, 2022, New JJCI changed its name to Johnson & Johnson Holdco (NA) (NJ), Inc. ("New JJCI/Holdco"). New JJCI/Holdco continued as a New Jersey corporation with its principal place of business in New Jersey.

j.  Subsequently, in or around December 2023, LTL Management, LLC changed its name to LLT Management, LLC.

203. Following the planned Project Plato, LTL Management, LLC declared Chapter 11 bankruptcy on or around October 14, 2021.

   a. A few weeks later, the Bankruptcy Court presiding over LTL Management, LLC's first bankruptcy case stayed and enjoined all litigation for the harm caused by Johnson's Baby Powder and other talc products against the debtor LTL Management, LLC, Johnson & Johnson, New JJCI/Holdco and various other entities, including Defendant PTI Royston, LLC.

   b. The United States Court of Appeals for the Third Circuit held on January 30, 2023, that the bankruptcy filing by LTL Management, LLC was not proper and made in bad faith. Ultimately, on April 4, 2023, the lower Bankruptcy Court formally dismissed the first LTL Management, LLC bankruptcy case.

   c. On April 4, 2023, a few hours after the first bankruptcy dismissal, LTL Management, LLC filed a second bankruptcy petition in the same court.

   d. On July 28, 2023, the Bankruptcy Court in the second LTL case issued an opinion granting motions to dismiss as filed in bad faith. The Bankruptcy Court formally dismissed the second bankruptcy on August 11, 2023.

204. The business of Old JJCI continued uninterrupted through New JJCI/Holdco after October 12, 2021. Substantially all of the assets of Old JJCI were transferred to New JJCI/Holdco and Old JJCI ceased to exist. Under Indiana and New Jersey substantive law, New JJCI/Holdco can be held responsible as the successor to Old JJCI. New JJCI/Holdco is the (a) "mere continuation" of Old JJCI, (b) result of a "*de facto* merger," (c) result of transactions made fraudulently to escape liability and (d) manufacturers, marketers and sellers of essentially the same "product lines" as Old JJCI.

   a. The employees of Old JJCI (including those involved in the manufacture, marketing and sales of Johnson's Baby Powder) continued working for New JJCI after October 12, 2021, in the same roles and responsibilities.

   b. The management of Old JJCI (including those involved in the manufacture, marketing and sales of Johnson's Baby Powder) continued in the same positions at New JJCI. Michelle Goodridge, Kevin Neat and Tina French held the same positions as officers and directors of Old JJCI and New JJCI before and after October 12, 2021.

    c. New JJCI operated out of the same manufacturing, marketing and sales facilities as Old JJCI. 199 Grandview Road in Skillman, New Jersey was the headquarters of Old JJCI and New JJCI.

    d. The manufacturing, marketing and distribution assets relevant to Johnson's Baby Powder were transferred from Old JJCI to New JJCI.

    e. New JJCI had the same employer identification number as Old JJCI.

    f. Aside from the allocation of *de minimus* revenue streams to LTL Management, LLC, the daily operations and business of Old JJCI remained unchanged following the transfer to New JJCI.

    g. New JJCI assumed and continued the same business licenses and business contracts with suppliers, manufacturers, vendors, retailers and other partners so that business operations would remain uninterrupted.

    h. Old JJCI and New JJCI had the same owners as vertically integrated under Janssen Pharmaceuticals, Inc. and Johnson & Johnson.

    i. From October 12, 2021 through the Kenvue spinoff in 2023, New JJCI continued to (a) profit from the sales of talc-based Johnson's Baby Powder still on the shelves in the U.S., including in Indiana, (b) make, market and sell talc-based Johnson's Baby Powder outside of the U.S. and Canada and (c) make, market and sell cornstarch-based Johnson's Baby Powder, a product intended for use for the same purpose with only a different ingredient.

205. In a series of transactions culminating in April 2023, Johnson & Johnson spun off its Consumer Health business segment, including the part of the business involved in manufacturing, marketing and selling Johnson's Baby Powder, to Kenvue, Inc.

    a. New JJCI/Holdco created a new subsidiary, Johnson & Johnson Consumer, Inc. ("JJCI 3.0"), in June 2022.

    b. "JJCI 3.0" was initially formed as a Nevada corporation before converting to a Delaware corporation around January 3, 2023. JJCI 3.0 was and is headquartered in New Jersey. Through early 2023, JJCI 3.0 did business under the name JNTL Consumer Health (NA).

    c. In January 2023, New JJCI/Holdco (parent of JJCI 3.0) transferred the assets, employees and business related to Johnson's Baby Powder to its subsidiary JJCI 3.0.

    d. On February 3, 2023, New JJCI/Holdco (parent of JJCI 3.0) transferred JJCI 3.0 to Janssen. Janssen transferred JJCI 3.0 (and other subsidiaries) to Janssen's

subsidiary, JNTL Holdings 2, Inc. JNTL Holdings 2, Inc. became the parent and owner of JJCI 3.0.

e. From early February 2023 to early April 2023, other subsidiaries were transferred to JNTL Holdings 2, Inc. (from DePuy Synthes, Inc. and Johnson & Johnson International, Inc.). JNTL Holdings 2, Inc. was ultimately transferred to Johnson & Johnson.

f. On April 4, 2023, Johnson & Johnson transferred JNTL Holdings 2, Inc. (parent of JJCI 3.0) to Kenvue, Inc. ("Kenvue"). Kenvue became the parent and owner of JJCI 3.0.

206. Johnson & Johnson's Consumer Health business segment, including the business related to making and selling Johnson's Baby Powder, continued uninterrupted in Kenvue. All (or substantially all) of the assets related to the manufacture, marketing and sale of Johnson's Baby Powder were transferred from New JJCI/Holdco to Kenvue, Inc. (owner and parent of Kenvue Brands, LLC f/k/a JJCI 3.0). Nothing related to the manufacture and sale of Johnson's Baby Powder remained under Johnson & Johnson. By Indiana and New Jersey substantive law, Kenvue can be held responsible for pre-October 2021 exposures to Johnson's Baby Powder as a successor under "mere continuation," "*de facto* merger" and "product line" theories.

a. Kenvue has held itself out as the continuation of Johnson & Johnson's Consumer Health business segment. In sworn admissions from Kenvue's president and CEO, Kenvue has "absolutely" held "itself out" as the "same company." Kenvue's public SEC filings refer to it as the same company. By design, the public perceives Kenvue as the continuation of Old JJCI.

b. All of the employees that worked under Johnson & Johnson's Consumer Health business segment were transferred to Kenvue (after an initial period in which some employees were shared between companies). Contracts between Johnson & Johnson and Kenvue ensured that employees continued in the same roles and responsibilities.

c. The management of Johnson & Johnson's Consumer Health business segment became the management of Kenvue after April 2023. Nearly every executive officer of Kenvue *e.g.*, Mr. Mongon, Mr. Ruh, Ms. Alvarado, Ms. Meurer, Mr. Orlando, Ms. Stevens, Dr. Tillett, Ms. Widmer) held the same (or substantially similar) positions for Johnson & Johnson's Consumer Health business segment.

d.  The manufacturing, marketing and distribution facilities of Johnson & Johnson's Consumer Health business segment, including those related to Johnson's Baby Powder, became the same facilities for Kenvue. Kenvue's principal office is the same location as that of Old JJCI and New JJCI/Holdco: 199 Grandview Road, Skillman, New Jersey. Lititz, Pennsylvania continued as the lead manufacturing facility for Johnson's Baby Powder before and after the Kenvue separation.

e.  All of the manufacturing, marketing, sales and distribution assets of Johnson & Johnson's Consumer Health business segment, including those related to Johnson's Baby Powder, were transferred to Kenvue.

f.  Johnson & Johnson transferred ownership of the intellectual property rights related to the Johnson's brand to Kenvue. Kenvue has the right to use (and has used) the Johnson's brand name, including as to Johnson's Baby Powder. Kenvue benefits from the goodwill, recognizability and customer base for Johnson's Baby Powder.

g.  Kenvue's business operations, including manufacturing and marketing operations, remain essentially unchanged from the Johnson & Johnson's Consumer Health business segment.

h.  Kenvue assumed and continued the same business licenses and business contracts with suppliers, manufacturers, vendors, retailers and other partners so that business operations would remain uninterrupted.

i.  After mid-August 2023, Kenvue continued to have the same ownership because Johnson & Johnson shareholders became Kenvue shareholders through a stock swap. Shares of Johnson & Johnson stock were exchanged for Kenvue shares.

j.  Per sworn testimony from Kenvue CEO and president Mr. Mongon and SEC filings through at least September 2023 (*i.e.*, well after the Kenvue spinoff in April 2023), Kenvue continued to (a) profit from the sales of talc-based Johnson's Baby Powder still on the shelves and/or available for purchase in the U.S., including Indiana, (b) make, market and sell talc-based Johnson's Baby Powder outside of the U.S. and Canada and (c) make, market and sell cornstarch-based Johnson's Baby Powder, a product intended for use for the same purpose with only a different ingredient.

207. The business of Old JJCI and New JJCI/Holdco, including the business related to making and selling Johnson's Baby Powder, continued uninterrupted in Kenvue Brands, LLC f/k/a JJCI 3.0. All (or substantially all) of the assets related to the manufacture, marketing and sale of Johnson's Baby Powder were transferred from New JJCI/Holdco to Kenvue Brands, LLC f/k/a JJCI 3.0 in about January 2023. Nothing related to making and selling Johnson's Baby Powder remained with New JJCI/Holdco. Under Indiana and New Jersey substantive law,

Kenvue Brands, LLC f/k/a JJCI 3.0 can be held responsible as the successor to Old JJCI and New JJCI/Holdco under "mere continuation," "*de facto* merger" and "product line" theories.

    a.  In about January 2023, essentially all of the employees of New JJCI/Holdco were transferred to Kenvue Brands, LLC f/k/a JJCI 3.0.

    b.  The management of New JJCI/Holdco (including those involved in the manufacture, marketing and sales of Johnson's Baby Powder) continued in the same positions at Kenvue Brands, LLC f/k/a JJCI 3.0. For example, Michelle Goodridge continued as president of Old JJCI, New JJCI/Holdco and Kenvue Brands, LLC f/k/a JJCI 3.0.

    c.  Kenvue Brands, LLC f/k/a JJCI 3.0 operated out of the same manufacturing, marketing and sales facilities as Old JJCI and New JJCI/Holdco. 199 Grandview Road in Skillman, New Jersey remained the headquarters of Old JJCI and New JJCI. Lititz, Pennsylvania continued as the lead manufacturing facility for Johnson's Baby Powder.

    d.  The manufacturing, marketing and distribution assets relevant to Johnson's Baby Powder were transferred to Kenvue Brands, LLC f/k/a JJCI 3.0.

    e.  The daily operations and business of Old JJCI and New JJCI/Holdco remained unchanged following the transfer to New JJCI.

    f.  Kenvue Brands, LLC f/k/a JJCI 3.0 assumed the same business licenses and business contracts with suppliers, manufacturers, vendors, retailers, etc.

    g.  Per sworn testimony from Kenvue CEO and president Mr. Mongon and SEC filings through at least September 2023 (*i.e.*, well after the Kenvue spinoff in April 2023), Kenvue Brands, LLC f/k/a JJCI 3.0 continued to (a) profit from the sales of talc-based Johnson's Baby Powder still on the shelves and/or available for purchase in the U.S., including Indiana, (b) make, market and sell talc-based Johnson's Baby Powder outside of the U.S. and Canada and (c) make, market and sell cornstarch-based Johnson's Baby Powder, a product intended for use for the same purpose.

    h.  On October 29, 2024, JJCI 3.0. filed a notice of conversion resulting in Kenvue Brands, LLC.

208. In addition to defendants Johnson & Johnson Holdco (NA) (NJ), Inc. ("New JJCI/Holdco"), Kenvue, Inc. ("Kenvue") and Kenvue Brands, LLC f/k/a Johnson & Johnson Consumer, Inc. ("JJCI 3.0") as successors to Old JJCI, Johnson & Johnson (the parent) bears legal responsibility for harm caused by Johnson's Baby Powder (and other talc products) sold

after January 1979. Johnson & Johnson is directly liable for its own wrongful conduct after January 1979, as described below and throughout this this Complaint. Johnson & Johnson exercised pervasive control over Old JJCI pertaining to the composition, testing, safety and labeling of, and public relations regarding, their talc-containing products, resulting in the continued sale of asbestos-containing Johnson's Baby Powder without warnings and Decedent's exposure (and injuries) therefrom. Additionally, Johnson & Johnson intermingled and commingled its various subsidiaries under its Consumer Health business segment (which included Old JJCI), disregarding their separate corporate status. Kenvue likewise did the same regarding Kenvue Brands, LLC f/k/a JJCI 3.0.

   a. As Johnson & Johnson admitted in sworn testimony, Johnson & Johnson (the parent) in New Brunswick, New Jersey, "made all health and safety policy decisions with regard to asbestos and talc issues."
        i. Throughout January 1979 to October 2021, Johnson & Johnson (the parent) remained actively involved in, exercised control over and had final approval over the manufacturing process of Johnson's Baby Powder. Johnson & Johnson oversaw talc processing, packaging and quality control of the talc used to make Johnson's Baby Powder. Johnson & Johnson participated in meetings with and audits of contract manufacturers and external testing laboratories.
        ii. Throughout January 1979 to October 2021, Johnson & Johnson (the parent) required approval of Old JJCI's labeling decisions related to Johnson's Baby Powder. Johnson & Johnson (the parent) had authority to put warnings on Johnson's Baby Powder.
        iii. Throughout January 1979 to October 2021, Johnson & Johnson (the parent) controlled public relations on the composition and safety of Johnson's Baby Powder. Johnson & Johnson drafted and published statements defending the composition and safety of the talc in Johnson's Baby Powder, received advance copies of media statements and operated websites that provided false and misleading information.
        iv. Throughout January 1979 to October 2021, Johnson & Johnson (the parent) directed and controlled litigation strategy on Johnson's Baby Powder and thus the control of public information.

   b. Throughout January 1979 to October 2021, Johnson's Baby Powder bottles bore the Johnson & Johnson name and trademarks (*e.g.*, Johnson's). Johnson & Johnson (the parent) owned the relevant trademarks. By design and intention, the public perceived Johnson's Baby Powder as a product made and sold by Johnson & Johnson (the parent).

c. Throughout January 1979 to October 2021, Johnson & Johnson (the parent) engaged in a conscious strategy for the wider Johnson & Johnson enterprise to benefit from the "emotional trust," recognizability and goodwill developed by its baby products line, including talc-based Johnson's Baby Powder.

d. Johnson & Johnson (the parent) owned the Vermont talc mines that (at times) sourced Johnson's Baby Powder and other talc products.

   i. In 1967-1989, Johnson & Johnson (the parent) exercised control over all key decisions in WMI's operations. Johnson & Johnson required WMI to submit approval for ore sources and report directly regarding asbestos testing.

   ii. In January 1989, Johnson & Johnson (the parent) (a) sold the talc mines to Cyprus Mines Corporation ("CMC"), (b) entered a supply agreement with CMC, (c) enforced strict quality control over CMC and (d) agreed to indemnify CMC for any liabilities arising from the sale or use of such talc.

   iii. Johnson & Johnson (the parent) assumed the liabilities for injuries resulting from WMI's conduct in 1967-1989.

e. Johnson & Johnson's (the parent) Consumer Health business segment intermingled and shared resources, assets, policies, management and employees without regard for the separate legal status of each operating subsidiary entity.

   i. Johnson & Johnson's Consumer Health business segment was *not* an independent corporate entity. It consisted of numerous operating subsidiaries, including Old JJCI and others.

   ii. Johnson & Johnson managed and operated the Consumer Health business segment jointly rather than through the lens of individual legal entities or operating subsidiaries.

   iii. Johnson & Johnson established, implemented and enforced various safety, health and quality control policies (including as to asbestos and talc) applicable to all of the separate legal entities within the Johnson & Johnson Consumer Health business segment. As a non-exclusive example, the "Johnson & Johnson Family of Consumer Companies Safety Management Team" set various safety policies applicable throughout the Johnson & Johnson Consumer Health business segment.

   iv. Employees, including at the management and executive level (*e.g.*, Ms. Michelle Goodridge), simultaneously held positions at Johnson & Johnson and the subsidiaries within Johnson & Johnson Consumer Health business segment.

f. The executives and directors of the subsidiaries of the Johnson & Johnson Consumer Health business segment never (or rarely) held meetings or conducted any operational functions. Per the sworn testimony of Ms. Goodridge, her role as president of Old JJCI consisted of merely signing the paperwork given to her by Johnson & Johnson's (the parent) legal team.

209. Before and during the time of Decedent and/or Decedent's family members' use of J&J's talc products (use of Johnson's Baby Powder through use on himself and through use by family members throughout his lifetime from birth until 2023), Johnson & Johnson defendants ("J&J") possessed specific knowledge that the talc in its products contained asbestos and inhaling such asbestos can cause fatal diseases, including mesothelioma. In other words, J&J knew the danger inherent in Johnson's Baby Powder.

   a. Before and during the time Decedent and/or Decedent's Family used J&J's talc products, J&J knew that asbestos exposure, including asbestos exposure from inhaling asbestos-containing talc, can cause fatal diseases such as mesothelioma.

   b. Johnson's Baby Powder ("JBP") sold in the United States contained (a) Windsor 66 (talc sourced from the Hammondsville, Argonaut and Hamm Vermont mines) in 1967 to late 1979 and mid-1980 to 2003, (b) Supra (talc sourced from the Fontane mine in Italy) in late 1979 to mid-1980 and (c) talc from the Guangxi, China reason from 2003 onward.

   c. Before and during the time Decedent and/or Decedent's Family used J&J's talc products, J&J knew of the association of talc and asbestos.

   d. Throughout the late 1960s to the 2000s, J&J repeatedly received information from its own consultants that the talc from the Vermont talc sources that it used in Johnson's Baby Powder contained asbestos.

   e. Before and during the time Decedent and/or Decedent's Family used J&J's talc products, J&J regularly recognized (internally or behind closed doors) the presence of tremolite and actinolite, including in their fibrous/asbestos varieties, in the talc used in Johnson's Baby Powder.

   f. Before and during the time Decedent and/or Decedent's Family used J&J's talc products, J&J knew that consumers like (and including) Decedent would inevitably inhale talc dust/powder (and therefore asbestos fibers) when using its products.

210. Despite all of the information that J&J knew and recognized (as described above), J&J (a) failed to warn, (b) failed to implement substitutes (*e.g*, corn starch) and (c) failed to adequately test and accurately report the presence of asbestos in its talc:

   a. J&J never warned. J&J never placed any sort of label on its products indicating they contained asbestos. J&J always told the public that there has never been a single asbestos fiber in its products.

b. J&J never affixed warnings stating that its products can cause cancer and mesothelioma.

c. Before 2016-2017, J&J never disclosed or otherwise reported to the public the hundreds of findings of asbestos minerals, fibrous tremolite/actinolite and/or asbestos that J&J received and/or knew about.

d. J&J failed to develop and fully implement a safer alternative to talc in Johnson's Baby Powder.

e. J&J failed to adequately test the talc in Johnson's Baby Powder for the presence of asbestos.

f. J&J designed its reporting methodology to yield negative results rather than accurate results.

g. J&J promoted regulations that called for less sensitive/powerful methods of detecting asbestos in talc.

211. J&J made false statements and concealed evidence that it possessed regarding the presence of asbestos in the talc in Johnson's Baby Powder.

a. J&J believed that Johnson's Baby Powder was its "flagship product." In numerous internal documents, J&J referred to Johnson's Baby Powder as its "sacred cow" and "golden egg."

b. J&J recognized that its businesses (a) benefited from the "emotional trust" and perception of "safety" developed from an "infant bond" with J&J's baby product line, including Johnson's Baby Powder and (b) would be adversely impacted by the reputational damage of its flagship product being associated with cancer.

c. J&J engaged in a pattern of making false statements to government entities, courts and the American public.

d. Discussions between the FDA and the CTFA subcommittee occurred throughout the early- to mid-1970s when the FDA was considering regulating and overseeing asbestos in cosmetic talc products.

e. The FDA eventually asked CTFA subcommittee members to send the FDA their own internal test results.

f. The FDA would use that information to evaluate the composition of popular cosmetic talc products and the frequency and the quality of industry's internal testing programs.

g.  CTFA members knew the FDA would base its decision on whether and how to regulate the industry on the information that members provided.

h.  J&J gave its response in writing on March 15, 1976. J&J told the FDA that, by XRD, DTA and TEM analysis, no asbestos had ever been found. J&J also asserted that "no amphiboles or serpentine minerals have been detected." As described above, these statements were demonstrably false.

i.  J&J knew the statements were false when it made them.

j.  J&J made many other false statements to the FDA and other government/regulatory bodies. For example, in October 1971, J&J knew about, approved of and ratified its consultant, McCrone, purposely omitting findings of asbestos in reports to be submitted to the FDA. J&J wrote to McCrone that presenting the truth "would only tend to confuse the issue perhaps with the FDA." Despite numerous findings of chrysotile asbestos by multiple analysts, J&J told FDA representatives in February 1975 that no cosmetics talcs (from J&J or otherwise) contain chrysotile. In response to a Citizens Petition to J&J and others regarding ovarian cancer risk, J&J told the FDA in 1995 that it had confirmed "the absence of asbestiform minerals." When editing J&J's website in 2016, J&J acknowledged internally that it "cannot say our talc-based consumer products have always been asbestos free." But, in March 2016, J&J represented to the FDA that no asbestos structures had ever been found in J&J's talc-based products by any testing method.

k.  J&J engaged in a pattern of manipulating and destroying evidence. In an October 1972 report, McCrone found tremolite asbestos in J&J talc products. J&J made a handwritten note stating: "DO NOT USE THIS REPORT." The report was then revised to remove the quantification of asbestos found. In March 1978, the CTFA conducted a "round robin" in which committee members tested each other's samples. When the results distributed amongst members showed which members' products contained asbestos, a J&J employee (and then-chairmen of the CTFA committee) instructed members to "destroy your copy of the table" containing the results. J&J and its consultant, McCrone, established a protocol where McCrone segregated positive findings. For example, in 1986, under McCrone Project No. ME-2275 and Purchase Order WS-0503, McCrone authored two separate reports of test results. The first stated all samples contained "no quantifiable" amounts of asbestos with three samples noticeably missing from the numbering sequence of samples. The second report showed the three talc samples each contained chrysotile asbestos.

l.  Since 1969, J&J knew of the potential for litigation arising from the inhalation of its talc products.

m.  Despite knowing the potential for litigation since 1969 and being involved in ongoing litigation from the 1970s onward, J&J failed to make any systematic effort to collect potentially responsive or relevant documents until the mid-1990s.

n.  J&J failed to institute a litigation hold and records retention policy until at least 1997. J&J (a) failed to maintain the underlying data (*e.g.*, data on the chemistry, crystal structure and shape of structures) for virtually all of the testing reports from its consultants that J&J claims show non-detects (thereby limiting Decedent's ability to challenge or contest those results), (b) failed to maintain vintage samples of Johnsons' Baby Powder and (c) failed to maintain information on blanks in sample testing (limiting Decedent's ability to refute J&J's specious claims of laboratory contamination).

o.  In litigation in the 1980s onward, J&J was repeatedly asked whether there exists "any evidence" that the talc in Johnson's Baby Powder contained asbestos.

p.  J&J cannot identify a single case prior to 2017 in which it disclosed evidence related to testing of Johnson's Baby Powder (or the sources of talc in Johnson's Baby Powder) for the presence of asbestos. J&J repeatedly made false statements in discovery responses that there was "no evidence" of asbestos (or even the mineral tremolite) in such talc.

212. On May 1, 2024, Johnson & Johnson and LLT Management LLC f/k/a LTL Management LLC announced a proposed Prepackaged Chapter 11 Plan of Reorganization for the resolution of all current and future claims related to ovarian and gynecological cancer arising out of use of Johnson & Johnson talc.

213. On August 19, 2024, a corporate restructuring was undertaken by Johnson & Johnson to effectuate a prepackaged bankruptcy Plan as to certain talc-related claims.

214. This "Corporate Restructuring" was implemented by (a) the conversion of Johnson & Johnson Holdco (NA) (NJ) Inc. ("Holdco") from a New Jersey corporation to a Texas limited liability named J&J Holdco (NA) LLC ("Holdco (Texas)"); (b) the merger of LLT with and into Holdco (Texas), as a result of which LLT ceased to exist as an entity and Holdco (Texas) remained as the surviving entity; and (c) a divisional merger of Holdco (Texas) under the Texas Business Organizations Code (the "Divisional Merger").

215. It is alleged by Johnson & Johnson that as a result of the "Divisional Merger", Holdco (Texas) now ceases to exist, and three new Texas limited liability companies were formed:

    a.   Red River Talc LLC ("Red River"), which was allocated all talc-related liabilities of LLT, other than those allocated to Pecos River Talc LLC ("Pecos River"), and specified assets;

    b.   Pecos River Talc LLC, which was allocated any talc personal injury claim that (i) alleges that the relevant injured or deceased individual was exposed to talc or the product or material containing talc, as applicable, in Canada or resided in Canada at the time such direct talc personal injury claim is filed, or was brought, threatened, or pursued in any court in Canada; (ii) any talc personal injury claim asserted or assertable by or on behalf of any governmental unit under any federal, state, international or foreign consumer or employee protection rule, statute, or regulation; (iii) any direct talc personal injury claim that alleges that the relevant injured or deceased individual developed mesothelioma or lung cancer (and not ovarian cancer, gynecological cancer, or any other disease) in connection with such individual's use of talc or a product or material containing talc ("Mesothelioma/Lung Cancer Talc Personal Injury Claims"); and (iv) any indirect talc personal injury claims to the extent in respect of any of the foregoing; and specified assets; and

    c.   New Holdco (Texas) LLC ("New Holdco (Texas)"), which was allocated all other liabilities and assets.

216. After the above described "Divisional Merger", New Holdco (Texas) LLC merged into J&J Intermediate Holding Corp. ("J&J Intermediate"), a New Jersey corporation.

217. Johnson & Johnson alleges as a result, New Holdco (Texas) ceases to exist, and J&J Intermediate remained but changed its name to Johnson & Johnson Holdco (NA) Inc. ("New Holdco").

218. Pecos River was allocated the liabilities for all Mesothelioma/Lung Cancer Talc Personal Injury Claims but maintains no assets of its own.

219. Instead, as an alleged component of the 2024 "Corporate Restructuring" there is a "funding agreement" between New Holdco (Texas) and Pecos River which allegedly obligates New Holdco (Texas) to provide funding to Pecos River to pay any and all costs and expenses of Pecos River incurred in the ordinary course and to satisfy liabilities of Pecos with respect to judgements and settlements resulting from Mesothelioma or Lung Cancer cases, and ancillary costs and expenses of the Pecos litigation.

220. As a result of the continual restructuring, divisional mergers, name changes and liability shifting orchestrated by Johnson & Johnson and its affiliated companies, Plaintiff asserts the claims at issue as to the exposures to Johnson & Johnson baby Powder, Shower-to-Shower Body Powder, and/or Neutrogena Cosmetic Powders against all Johnson & Johnson entities named herein under various piecing theories, including but not limited to, the Single Enterprise, Amalgamation of Interest, Enterprise Theory, Alter Ego, and/or traditional piercing of the corporate veil.  These companies have engaged in an orchestrated effort to shift assets and liabilities in an admitted manner to evade liability and to use the laws of certain states and the United States Bankruptcy Code as a sword against exposed individuals like the Decedent and others similarly situated. Plaintiff asserts the claims in this case against each and every Johnson & Johnson entity named in this complaint liable for the injuries caused herein. As detailed more fully above, the Johnson & Johnson Business Enterprise intentionally created subsidiaries that are wholly undercapitalized, have limited corporate records, are used to promote injustice, comingle assets, do not observe corporate formalities, share similar or even identical names, share common principal officers, directors, employees, and business purposes, and are located in the same offices.

221. Johnson & Johnson (the parent) maintains pervasive economic and corporate control over all created an/or restricted entities.

222. Finally, Johnson & Johnson (the parent) has substantially disregarded the separate nature of corporate entities listed above and created serious ambiguity about the manner and capacity of the various corporation within the Johnson & Johnson business enterprises making Johnson & Johnson (the parent) labile for Johnson's Baby Powder at all times.

**G.    Allegations regarding Defendant Johnson & Johnson ("J&J") and its Related Entities as Described Above**

223. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

224. Defendant JOHNSON & JOHNSON made false representations regarding the asbestos content of their talc products, including Johnson's Baby Powder and/or Shower-to-Shower used by Decedent and/or Decedent's family members. J&J's misrepresentations were deliberate and were effectuated through a campaign to hide and destroy laboratory testing detecting asbestos in Johnson's Baby Powder, to manipulate the protocols for such testing to falsely suggest no asbestos was found in Johnson's Baby Powder, and to repeatedly assert to the public and federal regulatory agencies that Johnson's Baby Powder was safe.

225. Johnson's Baby Powder was a critical cornerstone product for J&J, referenced as the company's "golden egg" and "sacred cow."  *See* Exhibit 1 (04/28/1997 The Johnson & Johnson Advantage: Emotional Trust); *see also* Exhibit 2 (08/18/1997 Mother-Baby Strategic Mission); *see also* Exhibit 3 (08/20/1997 Johnson & Johnson "Golden Egg" Advertising Strategy); *see also* Exhibit 4 (excerpt of 08/04/1999 Johnson & Johnson Baby Camp PowerPoint); *see also* Exhibit 5 (excerpt of 08/10/1999 Johnson & Johnson Baby Camp PowerPoint with Koffman (Golden Egg presentation)).

226. J&J knew that its talc products, including Johnson's Baby Powder, contained asbestos fibers, knew those asbestos fibers could cause cancer, and knew that it was not safe to be selling such products to the public for use on babies, children, and adults. In a memorandum dated April 9, 1969, J&J internally expressed concern that the presence of tremolite asbestos in its talc products would cause pulmonary diseases and cancer and increased the risk that the company would be drawn into litigation. J&J acknowledged that trace amounts of tremolite were unavoidable, and that efforts should be made to keep the amount of tremolite to a minimum.

227. In a memorandum dated July 30, 1971, J&J was informed that there is no place for asbestos in talc, trace amounts were not acceptable, and any talc with asbestos should be removed from the market. J&J was informed that no level of asbestos in talc is acceptable for use.

228. In a memorandum dated October 16, 1997, J&J acknowledged that there is no doubt that "mesothelioma can be caused by non-occupational exposure to mineral fibers" and that "mesothelioma may occur after brief or indirect exposure to asbestos." This memorandum further stated that tremolite is considered one of "the most potent mesothelioma producers" and that scientists contend that trace amounts of tremolite in other minerals is responsible for mesotheliomas.

229. In its memorandum of October 16, 1997, J&J acknowledged that "in several mesothelioma patients studied, both talc fibers and tremolite were detected.  In fact, the majority of asbestos bodies isolated from the lungs of women in the general population have tremolite or anthophyllite and because tremolite and anthophyllite are known contaminants of talc, this data suggests that rare cases of mesothelioma among women with no other identifiable exposure might be related to exposure to cosmetic talc." Further, an environmental factor that

must be given "major consideration in the incidence of Mesothelioma" includes "tremolite asbestos" which "is a known contaminant [of] some deposits of talc."

230. J&J's corporate representative has acknowledged in litigation that it has known for years that the talc used in Johnson's Baby Powder could be inhaled and reach deep into the lung. For decades, J&J has known about the dangers of talc powder inhalation during the normal use of its talc-based products, especially to babies.

231. The relationship between asbestos exposure and mesothelioma has been well understood since the 1960s and numerous studies confirm that causal relationship. J&J was aware of this causal relationship through its knowledge of the scientific literature and its membership in trade organizations through which such knowledge was distributed.

232. Beginning at least in the 1950s, J&J tested its talc for impurities or cominerals, including "asbestos" and "tremolite," because the company knew they are deleterious minerals that could be harmful to a person's health and thus should not be found in talc-based products. At all relevant times, J&J understood the dangers posed by asbestos exposure and that asbestos was a known impurity of talc.

233. J&J, internally and through hired testing laboratories such as the Battelle Memorial Institute, McCrone Associates, and the Colorado School of Mines Research Institute, tested for asbestos impurities in the source talc ore, processed ore, and finished products used to manufacture J&J talc products. All of these testing laboratories found asbestos minerals in J&J source talc ore or talc products. Independent labs have also found asbestos in the talc used in J&J talc products.

234. The existence of laboratory tests finding asbestos in J&J talc products and source talc used in those products has been verified by J&J under cross examination in recent litigation.

J&J knew about these positive test results all along. In 1972, J&J executives acknowledged internally that the results of testing demonstrating the presence of asbestos in J&J's talc products and the source ore used to make these products. At that time, J&J confirmed that McCrone found trace tremolite and that these findings are "not new."

235. In May 1973, Roger Miller, the President of J&J's mining company, Windsor Minerals, informed J&J that "the ore body contains actinolite." This talc ore body was actively used to produce J&J's talc products. One week later, J&J's records note that "[t]he first showing of actinolite we know about is October 1972."

236. J&J consistently lied about these positive test results for decades. In response to consumer inquires, J&J has assured consumers, including Decedent, that "asbestos has never been found in Johnson's Baby Powder and it never will." In print advertisements as late as December 19, 2018, J&J told the public, including Decedent, that "Baby Powder does not contain asbestos and never will. We test every single lot to ensure it." The Johnson's Baby Powder product label says it was the "Purest Protection" and it was advertised as "the best you can buy" and "the purest."

237. J&J has acknowledged that the intent of these representations to consumers, including Decedent, has always been to "to reassure them they could feel safe and comfortable using Johnson's Baby Powder because it does not contain asbestos" and to convey that in using Johnson's Baby Powder, there was "zero chance" of exposing their families to asbestos. The statements that Johnson's Baby Powder does not contain asbestos, that there was "zero chance" consumers were exposing their families to asbestos were false when they were made, and J&J knew they were false when they made those statements. As a direct result of J&J's false

representations that Johnson's Baby Powder never contained asbestos, millions of people, including babies, and Decedent, were unwittingly and needlessly exposed to asbestos.

238. J&J has never placed warnings on its talc-based powder products about the potential hazards presented by the product being aerosolized in normal application. J&J never placed warnings on its powder products about the risk of asbestos exposure or cancer.

239. Instead, J&J represented to the public that Johnson's Baby Powder was safe. J&J withheld from their spokespeople whose job it was to communicate the "no evidence of asbestos" message any reports indicating there was in fact evidence of asbestos in Johnson's Baby Powder. J&J's misrepresentations and omissions regarding the safety of Johnson's Baby Powder has resulted in consumer use, including use by Decedent, of this and other talc products in a potentially lethal way without any knowledge of the danger.

240. Since the early 1970's the FDA has repeatedly asked J&J whether there was any evidence of any amount of asbestos in any J&J talc product.  J&J's answer to the FDA's inquiries was always the same: there is no evidence of any amount of asbestos in any J&J talc product.  Over the course of more than four decades, J&J represented to the FDA over and over again that there is not a single instance or report of asbestos – including chrysotile asbestos – in its products.

241. In a letter dated September 21, 1971, J&J represented to the FDA that its data "conclusively proves that Johnson's Baby Powder is free of asbestos."  J&J has represented to the FDA that "no amphibole materials have been detected" in the company's talc-based products. Documentation of a meeting between J&J and the FDA in 1972 shows that, when pressed, J&J went so far as to represent to the FDA that "there wasn't a shred of evidence to support the idea that either our Johnson's Baby Powder contained any chrysotile asbestos."

242. Although aware of repeated McCrone reports over the course of years to the contrary, J&J falsely represented to the FDA that its consultant McCrone never found asbestos in the talc ore that was used to make Johnson's Baby Powder. In 1976, J&J rejected the FDA's request to provide the results of its respective periodic monitoring for asbestos.

243. J&J also submitted false and misleading statements through its trade association, the Cosmetic, Toiletry & Fragrance Association ("CTFA") (n/k/a Personal Care Products Council) ("PCPC"). The CTFA made false statements to the general public, including Decedent, and his family, news media, and government agencies, including, but not limited to the FDA, the National Institute of Occupational Health and Safety ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), the Mine Health and Safety Administration ("MHSA"), and the National Toxicology Program ("NTP"), which, in turn, proximately caused exposed persons' harm through intentional efforts to deceive the general public and regulatory authorities as to the safety of and presence of carcinogens in Johnson's Baby Powder.

244. J&J used the CTFA to communicate false information about the purity of its talc and lack of asbestos content, as evidenced by a letter dated March 15, 1976. This false information was then transmitted by the CTFA to the FDA to "give assurance as to the freedom from contamination by asbestos form materials of cosmetic talc products." This was done after J&J was aware of over 50 reports about asbestos minerals and fibers in the talc it used for talc products. Two weeks after relaying this false information, J&J met privately in Hillside, New Jersey and congratulated themselves on the "success" of the "presentations" to the FDA and agreed that they should not bind themselves to having to further update the FDA.

245. J&J and other industry members agreed to do testing on their respective talc products in a "round robin" format. The testing was done using a table that identified the manufacturer of the samples that were tested. Multiple samples contained asbestos. In a letter dated March 1, 1978, the Chairman of the CTFA Task Force on Round Robin Testing and then current employee of J&J instructed the CTFA to "destroy your copy of the table" containing the results finding asbestos in talcs.

246. Although possessing test results indicating that the talc used in its talc-based products contained tremolite and chrysotile asbestos — reportable as asbestos under federal regulations — J&J represented to the NTP that there was never any evidence of asbestos in the talc used in Johnson's Baby Powder.  And decades after asbestos was first reported, J&J continued to represent to the FDA that it had confirmed "the absence of asbestiform minerals" in its finished talc-based products. It did so in the CTFA's Comments in Response to a Citizens Petition dated June 27, 1995.

247. As recently as 2016, in a document dated March 17, 2016, J&J represented to the FDA that no asbestos structures have ever been found in its talc-based products in any testing anywhere in the world. This statement made to the FDA was false.

248. In an advertisement to the public dated December 19, 2018, J&J falsely claimed that it has cooperated fully and openly with the FDA and other regulators.  In fact, J&J did not provide the FDA with positive asbestos tests from its hired consultants, including McCrone, and the Colorado School of Mines. J&J did not tell the FDA that it possessed test results finding asbestos in the mine ore and the finished talc product nor did it give those results to the FDA.

249. J&J also used its consultants as vehicles to intentionally mislead the FDA. A letter dated October 12, 1971, evidence that J&J knew that its standby consultant McCrone purposely

omitted findings of asbestos in its talc-based products because it "would only tend to confuse the issue perhaps with the FDA" and that McCrone offered that if J&J "decide[d] to use these reports with the FDA" to "please call us."

250. As a part of its testing protocol for J&J's talc products, McCrone would segregate any test results that were positive for the presence of asbestos in talc ore or talc products from those that allegedly found "no quantifiable" asbestos. For instance, on April 29, 1986, under McCrone Project No. ME-2275 and Purchase Order WS-0503, McCrone authored two separate reports of test results for Windsor Minerals.  The first was for 11 talc samples in which "no quantifiable" amounts of asbestiform were found. The second was for the three talc samples (noticeably extracted from the numbering sequence) in which traces of chrysotile were found.

251. McCrone and J&J worked together to manipulate the asbestos testing results of J&J products done by outside laboratories and reported those manipulated findings to the FDA as negative results. For example, in a report dated October 27, 1972, McCrone found tremolite asbestos in J&J talc products but a handwritten note was written in large print on the front of the report stating: "DO NOT USE THIS REPORT." The report was revised to remove the quantification of asbestos found.

252. Similar asbestos findings by other J&J consultants were also hidden from the FDA. J&J submitted to the FDA testing performed by Professor Hutchinson from the Minnesota Space Center only in excerpts that removed all references to his "incontrovertible" findings of chrysotile asbestos. J&J did not submit a March 1974 test results from Professor Reynolds at Dartmouth College that "Actinolite is the dominant fiberform amphibole in the ore and talc product provided by Windsor Minerals." Instead, J&J submitted test results to the FDA from Dartmouth claiming that no amphiboles were found in the company's talc products.

253. J&J had its consultants use purposefully misleading laboratory tests to support its false claims that its talc ore and talc products were free of any asbestos. Since at least 1971, J&J has known that transmission electron microscopy ("TEM" or electron microscopy) is the superior microscope to detect asbestos in talc and was its consultants' recommended testing method. In fact, the positive asbestos results obtained by Professor Hutchinson utilized the TEM method. But J&J convinced the FDA that lesser test methods were effective, knowing that those lesser methods had failed to detect asbestos that was verified to be present in J&J's talc products. J&J routinely submitted test reports to the FDA as proof that its talc was asbestos free knowing that the methods used would not detect asbestos at low levels and thus were not reliable to rule out the presence of asbestos. For example, a McCrone report dated April 24, 1974, noted that lesser methods failed to find asbestos in over a dozen samples where the asbestos was confirmed when using the correct tool – TEM.

254. Despite J&J's knowledge that other testing methods missed verified asbestos in its talc, J&J advocated an industry standard using one of the weaker/lesser methods and claimed it would ensure the talc was asbestos free. This method is known as J4-1. The J4-1 testing method utilized x-ray diffraction ("XRD") as the initial screen to determine if any further testing was necessary. The limit of detection was between .5% and 5% and ensured that millions to trillions of asbestos fibers in a gram of talc could escape detection. Using the J4-1 method, if the XRD test result was negative, no more testing would occur, and the sample would be reported as "none detected." This process virtually guaranteed that low levels of asbestos would never be found. J&J also knew that XRD could not detect chrysotile at levels below two percent of the talc product and was also incapable of detecting low levels of tremolite. In the unlikely event an XRD test result was positive, J&J's second step utilized polarized light microscopy

("PLM"), also a lesser testing method, and J&J instructed the PLM analyst not to count all of the fibers he or she would actually see under the microscope. Short fibers, below a defined size, recognized as carcinogenic, were excluded from any reporting.

255. The CTFA's December 10, 1973, report confirmed that multiple talc sources, including Italian and Vermont talc, failed the proposed FDA's method because of elevated chrysotile concentrations. Thereafter, the CTFA proposed J4-1 knowing it was a "unreliable" testing method for asbestos in talc. The first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," resulted in six of seven participating laboratories failing to detect the tremolite. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the CTFA's J4-1 method. There is no evidence that CTFA or J&J ever shared this remarkable failure with the FDA or the public, including Decedent and his family.

256. J&J also knew that the "concentration method" of sample preparation was most able to detect the presence of asbestos in its talc and thus provide more accurate results. Internal memorandums from 1973 show that J&J understood that the concentration method was "much more sensitive than our proposed specifications" and when used found traces of tremolite which the J&J testing methods would fail to expose. J&J's stated concern with using a concentration method, set forth in a memorandum dated May 16, 1973, was that it was too good at detecting asbestos – it was too sensitive. Correspondence dated February 18, 1975, indicates that J&J rejected the concentration method because the effective and sensitive testing was not "in the worldwide company interest." Indeed, many of J&J's consultants — including the Colorado School of Mines, Professor Pooley of Cardiff University, Professor Reynolds of Dartmouth College, and Professor Alice Blount of Rutgers University — found asbestos in J&J's talc-

based products using the concentration method. J&J did not provide any of those test results to the FDA, however.

257. When J&J finally decided to use TEM on a limited basis in 1995, it implemented a TEM reporting methodology designed to yield negative, rather than accurate results. J&J called its method TM7024. According to this method, a lab would report the test results as negative and "not quantifiable" unless the scientist counted 5 or more asbestos fibers of the same variety in an incredibly small sample (it varied but was well under 50 milligrams). Thus, even if the examiner identified, counted and quantified as many as 16 asbestos fibers (four fibers of tremolite, four fibers of actinolite, four fibers of anthophyllite, and four fibers of chrysotile) the finding of asbestos was not to be reported. This method instructed labs who confirm the presence of asbestos in incredibly small samples to "couch" the results in specific and deceptive language that the lab "did not find any quantifiable amount of asbestosforms minerals." J&J's position about the scientific propriety of its TM7024 testing protocol was and remains inconsistent with EPA protocols for counting asbestos fibers.

258. Even though J&J tested miniscule amounts of product, and utilized methods specifically designed to yield negative results, asbestos was still found in J&J's talc. J&J never produced these test results to the public until 2017. In editing information for its website in about 2016, J&J acknowledged internally that it "cannot say our talc-based consumer products have always been asbestos free."

259. J&J represented to the FDA that the most sensitive testing was not needed because "substantial asbestos can be allowed safely in baby powder." J&J also claimed that "extensive" animal studies of its Vermont and Italian talc revealed no cancer risk from their talc. J&J now admits that only one study was done of its Vermont talc and only one study of its Italian talc as

it relates to the risk of cancer from talc. The FDA was not told tests were conducted on a special lot of "extremely clean" talc. This information was first disclosed in litigation from J&J internal records, first produced no earlier than 2017.

260. J&J knew that it had liability to persons who developed asbestos-related diseases as a result of exposure to its talc products. In an internal communication dated April 15, 1969, the Medical Director for J&J wrote to advise the company of danger relative to "inhalation" of the "needle-like" crystals of tremolite asbestos in J&J's talc. J&J was cautioned that "since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that [J&J] could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations." To that end, Dr. Thompson recommended that "someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise." The medical director further forewarned J&J that the company could confront a situation where the company would be more or less compelled to remove its talc products "if it became known that our talc formulations contained any significant amount of Tremolite." This prediction of litigation came to fruition shortly thereafter. J&J has reported that during the 1970s alone, the company was sued in talc-based cases in 1971, 1972, 1973 1974, 1976, 1977, 1978, and 1979.

261. Due to the litigation process, J&J has been forced to identify documents from as early as 1971 (and every year thereafter) relating to "ongoing," "pending," and "anticipated" litigation regarding Johnson's Baby Powder. Since at least 1971, J&J has known that information in the company's possession relevant to or produced in any particular talc-based lawsuit would be relevant to discovery in future talc-based cases. Although J&J was legally

obligated to retain the evidence, it does not know where the documents and evidence related to these cases are located or whether they even exist. Entries on J&J's privilege log indicate that samples of talcum powder used in litigation existed at the time the litigation in the 1970s was pending but are no longer available.

262. Despite being involved in litigation for decades, J&J never produced a single asbestos test in any case prior to 2017, even when specifically requested. J&J was repeatedly asked in litigation whether the talc used in any of its talc-based products contained any amount of asbestos. J&J represented to certain plaintiff's counsel that "there was no evidence" of asbestos in its talc. These representations exemplified J&J's pattern and practice in defending talc-injury litigation, which was to conceal evidence of asbestos in its talc products and represent that no such evidence ever existed. Many of the same J&J executives who were involved in discussions with the FDA about the company's talc-based products were involved in defending J&J in litigation alleging asbestos-related injuries from talc-based products.

263. J&J routinely provided sworn affidavits from company executives falsely asserting that there was no evidence of asbestos in the talc used for J&J products.  In addition to submitting false affidavits, J&J repeatedly certified answers to interrogatories stating that there was never any evidence of asbestos in any J&J talc product when it knew the truth to be otherwise. J&J knew there was tremolite in Johnson's Baby Powder when responding to discovery requests in the Krushinski case. J&J has been forced to admit that these interrogatories, which were answered in conjunction with the company's lawyers, were false.

264. J&J concealed and refused to produce in response to certain plaintiff's discovery requests any documents evidencing or relating to tests, studies, investigations, and analyses of

Johnson's Baby Powder for the presence of asbestos, despite its knowledge that relevant and material documents existed and were in its possession and that it had the duty to disclose them.

265. Although J&J by its own admission had an obligation to preserve evidence once litigation concerning the health effects of its talc products was foreseeable, it failed to do so. J&J knew that evidence adduced in litigation concerning the health effects of its talc products would be material and relevant to other anticipated cases. Yet J&J failed to preserve records from any of the lawsuits that alleged injuries as a result of Johnson's Baby Powder, talc, or asbestos, even though J&J knew that relevant and material documents existed and were in its possession.

266. J&J did not retain any samples of its talc ore and milled talc used in its talc-based products, which it tested regularly for the presence of asbestos and asbestiform minerals at any time until 2017. Although litigation was pending and anticipated, the samples chosen by J&J specifically to create test results were not retained under the company's evidence retention schedules and were not subject to any litigation-hold. J&J also failed to retain all test results for the presence of asbestos and asbestiform minerals of the talc ore and milled talc used in its talc-based products. The failure to institute a litigation hold made certain that the testing results were destroyed in accordance with its document retention policy. In 2008, nearly ten years after the first litigation hold, when asked about retention time for "information related to the CTFA ingredient surveys" J&J directed its employees to "PITCH them." Any test results that J&J has not yet produced are presumed to be destroyed, as the disposal of these results were mandated by the company's evidence retention scheduled absent a litigation hold, which J&J never issued.

267. The limited underlying scientific data that still exists of J&J's consultants confirms that the reports of "no detectable" asbestos are belied by the underlying scientific data, which shows evidence of asbestos. There are countless similar non-detect letters with no underlying data.

268. In 1989, after facing litigation related to its talc-based products for nearly two decades and anticipating further litigation, J&J destroyed records relating to its Hammondsville, Vermont mining operations.

269. J&J historically preserved no records from the majority of cases in which it has been sued for causing talc related injuries. For those cases where there is at least some documentation, J&J either lost or destroyed most of the material evidence related to historical litigation alleging asbestos-related disease from its talc products. Despite being involved in many cases dating back to 1971, J&J could only locate two sets of discovery responses for its corporate representative to review.

270. J&J once maintained a paper file documenting all of its telephone conversations with the FDA related to its talc-based products dating to the early 1970s. The "FDA Call File" no longer exists.

271. J&J intentionally and fraudulently continued to misrepresent to the public, including Decedent and his family, that Johnson's Baby Powder was safe, concealing the dangers of asbestos exposure and evidence of asbestos in J&J's talc product.   J&J's misrepresentations, concealment, and omissions regarding the safety of Johnson's Baby Powder have resulted in consumer use of talc products in a potentially lethal way without any knowledge of the danger, thus denying Decedent and/or his family members the knowledge with which to avoid further exposure.

272. Decedent and/or his family members trusted Johnson's Baby Powder. They used it believing it to be safe. Decedent and/or his family members trusted that the talc products they used were safe and did not have any carcinogens. Decedent and/or his family members relied on J&J to provide any safety information to him and to make sure any life-threatening hazards were communicated to them. Had the Decedent known the true facts, he would never have purchased or used the products.

**H.    Allegations Specific to Pfizer, Inc.**

273. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

274. Some of the corporate history relevant to Plaintiffs' claims against defendant Pfizer, Inc. are as follows:

a.   From 1962 to 1992, Pfizer had an operating division (as distinguished from a separate subsidiary) that was initially called its Minerals, Pigments & Metals ("MPM") division. Among other minerals, Pfizer's MPM division mined, processed and sold talc (a) from the southern Death Valley, California region from 1962 to 1987 and (b) from southwest Montana (including the Treasure and Regal mines) from 1966 to 1992.

b.   Pfizer sold MPM talc to the cosmetics industry directly and through distributors, including WC&D.

c.   Pfizer's MPM division operated facilities mining or processing calcium carbonate in or around Adams, Massachusetts. There, Pfizer used substantially similar asbestos monitoring procedures as it did for talc.

d.   Pfizer's MPM division designed, made and sold asbestos-containing products Kilnoise from at least 1965 to 1972 and Firex from at least the early 1970s to 1986.

e.   From 1963 to 1992, Pfizer's operating division (as distinguished from a separate subsidiary) Coty that designed, made, marketed and sold cosmetic products, including talc-containing products such as body powders (*e.g.*, Emeraude, L'Aimant, Exclamation, Wild Musk) and face powders (*e.g.*, Coty Airspun) that it marketed and sold nationwide, including in Indiana. Pfizer's Coty division used substantially similar asbestos monitoring, testing and labilities policies as Pfizer MPM. At one time, Pfizer maintained a personal care product division,

Leeming/Pacquin that, among other things, designed, made, marketed and sold talc-containing products, including Coty and Desitin baby powder.

    f.   In 1992, Pfizer spun off its former (a) MPM division (including its Montana talc operations), selling it to Minerals Technologies, Inc. ("MTI") and (b) Coty division.

275. Pfizer both (a) sold talc directly to large-scale product manufacturers and (b) made purposeful efforts to enter distribution agreements with distributors (including WC&D) to promote and sell Pfizer's talc to large-scale product manufacturers that incorporated Pfizer's talc into finished products that were marketed and sold nationally, including in Indiana:

    a.   Pfizer made purposeful efforts to enter distribution agreements with WC&D because of its contacts with large-scale product manufacturers in the cosmetic and personal care industry (among other industries). As a non-exclusive example, distribution agreements between Pfizer and WC&D state that WC&D has the "ability, facilities, personnel and technical qualifications to promote the sale [of Pfizer's talc] as well as extend credit to its customers and to provide purchasers [of such talc] with satisfactory technical services and product deliveries."

    b.   Pfizer (a) knew the identity, scale and nationwide marketing and distribution scope (that included Indiana) of the large-scale product manufacturers that its talc was sold directly to and distributed to and (b) intended such large-scale product manufacturers to specify Pfizer talc in such products. Pfizer (i) participated in the solicitation and negotiation for such business, (ii) promoted particular talc grades that they sold as meeting the performance specifications of finished products sold by such customers, (iii) provided talc samples and/or information to the large-scale product manufacturers to meet their quality control and/or raw material approval processes and (iv) maintained regular correspondence with such large-scale product manufacturer accounts regarding the packaging, delivery, price and quality (*e.g.*, MSDS, Certificates of Analysis).

    c.   Pfizer joined, attended, advertised in and/or participated in (a) nationwide industry organizations (*e.g.*, the CTFA), (b) nationally-distributed trade publications (*e.g.*, magazines, newsletters) and (c) trade shows and conferences to, among other reasons, remain informed about the nature of the market for talc in the cosmetic and personal care industries, solicit business with such large-scale product manufacturers and contribute to industry efforts to influence federal regulations impacting talc.

276. Pfizer, directly and through distributors (*e.g.*, WC&D), sold talc that was incorporated in finished products that Decedent and/or his family purchased and used in Indiana:

    a. Throughout at least 1987 to 1992, Pfizer made sales directly to Revlon and WC&D sold substantial quantities of Pfizer-sourced talc to Revlon. Revlon codes specifying WC&D talc grades containing Pfizer's Montana talc include (but are not limited to) "Arbit 98061" (WC&D's Talc 141 after 1981), "Askii 111518" (WC&D's Talc 1745, Pfizer's MP 50-30 and MP 60-30) and "Jaybar 98442" (WC&D's Talc 2611, Pfizer MP 25-38). Revlon specified "Arbit 98061" (WC&D's Talc 141) in Revlon's Touch & Glow face powder and "Blush On" blushes throughout at least 1985 through at least 1992 (such that, each time someone used those products, they came exposed to Pfizer-sourced talc). Revlon specified Pfizer-sourced talc in face powders, blushes and eye shadows that Decedent purchased and used, including in Indiana.

    b. Throughout at least 1987 to 1992, WC&D sold substantial quantities of Pfizer-sourced talc to the entities making CoverGirl products (Noxell, Procter & Gamble ["Noxell/P&G"]). Noxell/P&G raw material codes during this period that specified WC&D talc grades containing Pfizer's Montana talc include (but are not limited to) RM# 801530 (WC&D's Talc 399, Pfizer MP 12-50), RM# 802980/802981 (WC&D's Talc 141), RM# 804830 (WC&D Talc 2755, Pfizer MP 12-48) and RM# 806280 (WC&D's Talc 9441). Noxell/P&G specified Pfizer-sourced talc in Cover Girl face powders, blushes and eye shadows that Decedent purchased and used, including in Indiana.

277. Throughout 1975 to 1992, Pfizer possessed specific knowledge that the talc in its products contained asbestos and inhaling such asbestos can cause fatal diseases, including mesothelioma. In other words, Pfizer knew the risks and dangers of its talc products.

    a. By 1962, Pfizer knew of the association of asbestos and talc (or that asbestos often occurs as an accessory mineral to talc). Pfizer admitted that, by 1962, it knew that its California talc contained tremolite, some of which occurred as fibrous tremolite (*i.e.*, asbestos). By 1968, Pfizer acknowledged that talc ores "commonly" contain tremolite and anthophyllite that may occur in a fibrous morphology.

    b. By July 1971, Pfizer was aware of publicity regarding asbestos in talc used in cosmetic products. In August 1971, Pfizer sent two representatives to attend an FDA-sponsored conference discussing, among other things, analytical methods to detect asbestos in talc and the presence of asbestos in talc intended for cosmetic uses.

c. By 1972, Pfizer recognized that the talc from the Fontane mine in Val Chisone, Italy that was used in Coty products (that Pfizer sold) contained asbestos. After testing Talc 1615 by TEM with selected area electron diffraction ("SAED"), Pfizer reported internally in December 1972 that it found "a very occasional fiber which we suspect to be asbestos." From March 1976 to 1992, Pfizer's internal testing using TEM with SAED identified asbestos fibers in milled talc sourced from the Fontane mine in Val Chisone, Italy (Talc 1615, Supra) on at least 115 occasions.

d. By 1973, Pfizer received information that talc sourced from its southwest Montana mines (Treasure, Regal) contained asbestos. In December 1973, Pfizer received the results of round robin testing of Pfizer's Montana talc showing multiple CTFA members finding tremolite and chrysotile fibers.

e. Beginning in 1974, Pfizer repeatedly identified tremolite in numerous samples of milled talc sourced from its southwest Montana mines.

f. Throughout 1977 to 1992, Pfizer repeatedly detected asbestos fibers in milled talc samples sourced from its Treasure and Regal mines, including MP 12-50 (a/k/a Talc 399), MP 50-30 (a/k/a Talc 1745) and Talc 141.

g. In July 1988, Pfizer internally recognized the "problem" of "both tremolite and chrysotile mineralization at our Treasure Mine."

h. In testing of the talc ore body to be mined in 1988 to 1992, Pfizer internally found asbestos fibers by TEM/SAED in well over 100 samples.

i. By early 1991, Pfizer reported internally that, in one subset of its Montana talc samples tested by TEM/SAED, Pfizer found (a) 114 ore samples (drill cuttings) contained tremolite fibers, (b) 46 milled product samples contained tremolite fibers and (c) Pfizer allowed shipment of the milled product to customers before Pfizer received test results, thereby permitting the consuming public to become exposed to asbestos.

j. As a member of the National Safety Council since at least 1956, Pfizer regularly received summaries of scientific literature on safety and occupational health, including on the dangers of asbestos exposure.

k. As a maker and seller of the asbestos-containing products (*e.g.*, Kilnoise, Quigley, Firex), Pfizer held the obligation of being an expert on asbestos and remaining abreast of the scientific literature on asbestos.

l. Pfizer knew that exposure to asbestos could cause (a) disease by the late 1960s and (b) mesothelioma by no later than 1971. By July 1971, Pfizer was familiar with the publications of Dr. Selikoff and created a biography on him. In April 1977, Pfizer's MPM President told the President and CEO of Pfizer: "Prominent medical doctors, especially Dr. Irving Selikoff of Mt. Sinai, have consistently stated there is

sufficient medical evidence to classify all asbestiform minerals as potential carcinogens."

m. By the early 1970s, Pfizer knew that relatively low levels of asbestos exposure can fatal disease. In January 1973, Pfizer discontinued "… any use of loose fibrous asbestos." In April 1974, Pfizer distributed internally a publication on the unsafe levels of asbestos exposure from sanding joint compound. In January 1976, Pfizer acknowledged internally that it "does not have any sound medical or scientific basis for arguing against the lowering of the airborne concentration limits" below 2 f/cc.

n. Pfizer knew that asbestos-containing talc can cause fatal disease, including mesothelioma. In the mid-1970s, Pfizer's management told its own employees that the needle-shaped tremolite in its own California talc can cause cancer. In a December 1976 memorandum, Pfizer listed "cosmetic talc" as having the "health hazard" of "asbestos – yes." By 1977, Pfizer's talc customers received OSHA citations for violating airborne asbestos and labeling regulations. In April 1979, Cal-OSHA told Pfizer that talc with fibrous tremolite in concentrations less than 0.1% by weight are a health concern and can generate airborne exposures of 4 f/cc. By 1982, Pfizer was named as a third-party defendant in a case alleging Pfizer's Montana-sourced talc caused someone to develop mesothelioma.

278. Despite all of the information that Pfizer knew about the asbestos content and danger from inhaling the talc it sold (as described above), Pfizer (a) failed to warn and (b) failed to accurately report the presence of asbestos in its talc.

a. Pfizer failed to warn. Pfizer failed to place any labels, cautions or warnings on any of the talc that it sold (that was ultimately incorporated in products that Decedent and/or his family members used) stating that the talc contained asbestos. Pfizer failed to provide customers and the public the information that it possessed regarding the composition of its talc, including the dozens of test results that it possessed showing asbestos fibers in its talc ore and milled talc. Pfizer failed to warn its customers and the public about the dangers of inhaling the asbestos-containing talc that it sold.

b. Pfizer knew that the presence of any amount of asbestos required asbestos labels and appropriate warnings. As a non-exclusive example, Pfizer MPM management recognized internally in February 1980 that if tremolite fibers exist in the talc product or can be identified (no matter how low the concentration), "such a product should be properly labeled."

c. Pfizer knew the criteria for (and health significance of) identifying asbestos. In October 1974, Pfizer met with MESA representatives who defined tremolite asbestos as "tremolite containing fibers." In a public submission to OSHA on behalf of Pfizer in February 1976, Pfizer (a) endorsed the definition of asbestos and asbestos fibers proposed by OSHA (specifically, particles of the one of the

regulated asbestos minerals with a minimum length of 5 micrometers and length-to-width ratio of at least 3:1) and (b) asserted the proposed definitions appropriately address health concerns. Pfizer MPM management recognized in February 1977 that (a) respirable tremolite particles possessing the chemistry and morphology of a fiber can "institute a cancerous condition" and (b) "the government defines the fiber as such because of the health hazard involved."

d. Pfizer made a conscious choice to tolerate, overlook and accept significant concentrations of asbestos in the talc that it sold and concealed that choice through applying a knowingly-false reporting protocol. Internally, when testing samples by TEM/SAED, Pfizer correlated about 200 asbestos fibers per 10 grid openings with 0.1% asbestos by weight. Under this scheme, Pfizer reported samples with up to 199 asbestos fibers per 10 grid openings as being below the "detection limit" or "not detected." Pfizer then refused to inform the customer, end user and the public of the (substantial number of) asbestos fibers observed. Pfizer repeatedly recognized internally in the 1970s to 1980s that (a) Pfizer's correlation of 200 asbestos fibers per 10 grid openings with 0.1% asbestos by weight was off by a factor of 3 to 30 (*i.e.*, 200 fibers equaled 0.3 to 3.0% by weight), (b) Pfizer could detect (and did detect) asbestos at concentrations less than 0.1% by weight and (c) the 0.1% figure (miscalculated by a factor of 3 to 30) served as an "acceptance limit," *not* a "detection limit."

279. Pfizer, Inc. is registered to do business in Indiana and maintains a registered agent for service of process in Indiana.

280. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

## I.    Specific Allegations as to Each Defendant

281. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

282. The following Defendants manufactured, sold, or distributed asbestos or asbestos containing products and asbestos talc products to which Decedent was exposed:

a. The Defendant, ALBERTSONS COMPANIES, INC., was or is engaged in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, rebranding, or the like and

otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products to which Decedent was exposed through his own personal use and/or through use by his family members. Further, ALBERTSONS COMPANIES, INC.  manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to multiple name brands of cosmetic and body talc powders and baby powder talc products, which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

b.  The Defendant, BAYER CONSUMER CARE HOLDINGS LLC, f/k/a MSD Consumer Care, Inc., was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like and/or supplying asbestos-containing products, including cosmetic talc products with asbestos impurities, to which Decedent was exposed through his own use and/or use by family members of these talc products.  Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, BAYER CONSUMER CARE HOLDINGS LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to Dr. Scholl's and Lotrimin foot powder with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this

Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

c.   The Defendant, BAYER HEALTHCARE LLC, a subsidiary of Bayer AG, was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like and/or supplying asbestos-containing products, including cosmetic talc products with asbestos impurities, to which Decedent was exposed through his own use and/or use by family members of these talc products.  Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, BAYER HEALTHCARE LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to Dr. Scholl's and Lotrimin foot powder with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

d.   The Defendant, BAYER SAMSON II LLC, f/k/a Dr. Scholl's LLC, was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like and/or supplying asbestos-containing products, including cosmetic talc products with asbestos impurities, to which Decedent was exposed through his own use and/or use by family members of these talc products.  Decedent was exposed to fibers from these products by family members

through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, BAYER SAMSON II LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to Dr. Scholl's and Lotrimin foot powder with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

e.  The Defendant, BLOCK DRUG COMPANY, INC., individually and as successor to The Gold Bond Sterilizing Powder Co. a/k/a The Gold Bond Co. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like and/or supplying asbestos-containing products, to which Decedent was exposed to respirable asbestos fibers in the State of Indiana and/or other Sates, through his own use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, BLOCK DRUG COMPANY, INC. mined, milled, manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Gold Bond talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in

the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

f.    The Defendant, CONOPCO INC., was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, CONOPCO INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Axe body talcum powder spray products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

g.    The Defendant COSMETIC SPECIALTIES, INC. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed in the State of Indiana through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, COSMETIC SPECIALTIES, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-

containing products, including but not limited to, CoverGirl, Revlon and Estée Lauder cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

h.  The Defendant COTY INC., individually and as successor in interest to CoverGirl Cosmetics, Inc., was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, COTY INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, CoverGirl cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

i.  The Defendant, CVS PHARMACY, INC., was or is engaged in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, rebranding, or the like and otherwise

placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products to which Decedent was exposed through his own personal use and/or through use by his family members. Further, CVS PHARMACY, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to multiple name brands of cosmetic and body talc powders and baby powder talc products, which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

j.  The Defendant DANA CLASSIC FRAGRANCES, INC. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, DANA CLASSIC FRAGRANCES, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Chantilly body talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or

other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

k.  The Defendant E.L.F. COSMETICS, INC., was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, E.L.F. COSMETICS, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, e.l.f. cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

l.  The Defendant, THE ESTÉE LAUDER COMPANIES, INC., individually and as successor-in-interest to Bobbi Brown Professional Cosmetics, Inc., Clinique, Tom Ford, and Make-Up Art Cosmetics, Inc., was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom.

Further, THE ESTÉE LAUDER COMPANIES, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Estée Lauder cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

m.  The Defendant, ESTÉE LAUDER INC., individually and as successor-in-interest to Bobbi Brown Professional Cosmetics, Inc., Clinique, Tom Ford, and Make-Up Art Cosmetics, Inc., was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, ESTÉE LAUDER INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Estée Lauder cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

n.  The Defendant ESTÉE LAUDER INTERNATIONAL, INC., individually and as successor-in-interest to Bobbi Brown Professional Cosmetics, Inc., Clinique, Tom Ford, and Make-Up Art Cosmetics, Inc., was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, ESTÉE LAUDER INTERNATIONAL, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Estée Lauder cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

o.  The Defendant EXCLUSIVE FRAGRANCES & COSMETICS INC. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, EXCLUSIVE FRAGRANCES & COSMETICS INC. manufactured, distributed, sold and supplied substantial amounts

of asbestos-containing products, including but not limited to, Chantilly body talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

p.  The Defendant GOLD BOND CO LLC was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, GOLD BOND CO LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Gold Bond body talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

q.  The Defendant IMI FABI (DIANA) LLC was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which

Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, IMI FABI (DIANA) LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, CoverGirl, Estée Lauder and Revlon cosmetic and/or body talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

r.  The Defendant IMI FABI (USA) INC. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, IMI FABI (USA) INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, CoverGirl,  Estée Lauder and Revlon cosmetic and/or body talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State

of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

s. The Defendant IMI FABI, LLC was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, IMI FABI, LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, CoverGirl, Estée Lauder and Revlon cosmetic and/or body talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

t. The Defendant INTERCOS AMERICA, INC. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, INTERCOS AMERICA, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing

products, including but not limited to, Estée Lauder and Mary Kay cosmetic and/or body talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

u.  The Defendant JOHNSON & JOHNSON was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, JOHNSON & JOHNSON manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Johnson & Johnson Baby Powder talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

v.  The Defendant JOHNSON & JOHNSON HOLDCO (NA) (NJ) INC., (a/k/a "New JJCI/Holdco") (f/k/a Johnson & Johnson Consumer Inc.), individually and as successor-in-interest to Johnson & Johnson Consumer Inc. (a/k/a "Old JJCI") was or is engaged in

the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, JOHNSON & JOHNSON HOLDCO (NA) (NJ) INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Johnson & Johnson Baby Powder talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

w.  The Defendant JOHNSON & JOHNSON HOLDCO (NA) INC. f/k/a J&J Intermediate Holding Corp.; individually and as successor-in-interest to J&J Holdco (NA) LLC (a/k/a "New Holdco (Texas)"), was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, JOHNSON & JOHNSON HOLDCO (NA) INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-

containing products, including but not limited to, Johnson & Johnson Baby Powder talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

x.   The Defendant KENVUE INC., individually and as successor-in-interest to Johnson & Johnson Consumer Inc. (a/k/a "Old JJCI") and Johnson & Johnson Holdco (NA) Inc. (a/k/a "New JJCI/Holdco") (f/k/a Johnson & Johnson Consumer Inc.), was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, KENVUE INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Johnson & Johnson Baby Powder talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

y. The Defendant KENVUE BRANDS, LLC f/k/a JOHNSON & JOHNSON CONSUMER INC. (a/k/a "JJCI 3.0"), individually and as successor-in-interest to Johnson & Johnson Consumer Inc. (a/k/a "Old JJCI") and Johnson & Johnson Holdco (NA) Inc. (a/k/a "New JJCI/Holdco") (f/k/a Johnson & Johnson Consumer Inc.) was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, KENVUE BRANDS, LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Johnson & Johnson Baby Powder talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

z. The Defendant, THE KROGER CO., was or is engaged in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, rebranding, or the like and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products to which Decedent was exposed through his own personal use and/or through use by his family members. Further, THE KROGER CO.

manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to multiple name brands of cosmetic and body talc powders and baby powder talc products, which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

aa. The Defendant L'ORÉAL USA PRODUCTS, INC. individually and d/b/a Lancôme and Maybelline, was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, L'ORÉAL USA PRODUCTS, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, L'Oréal and Maybelline cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

bb. The Defendant L'ORÉAL USA, INC. individually and d/b/a Lancôme and Maybelline, was or is engaged in the business of manufacturing, importing, compounding, selling,

assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, L'ORÉAL USA, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, L'Oréal and Maybelline cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

cc. The Defendant LLT MANAGEMENT LLC f/k/a LTL Management LLC, was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, LLT MANAGEMENT LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Johnson & Johnson Baby Powder talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all

times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

dd. The Defendant, MACY'S, INC. was or is engaged in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, rebranding, or the like and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products to which Decedent was exposed through his own personal use and/or through use by his family members.  Further, MACY'S, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to multiple name brands of cosmetic and body talc powder products, which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

ee. The Defendant, MARTIN HIMMEL INC. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, MARTIN

HIMMEL INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Gold Bond talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

ff.  The Defendant MARY KAY INC. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, MARY KAY INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Mary Kay cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

gg. The Defendant, MERCK & CO., INC. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like and/or supplying asbestos-containing products, including

cosmetic talc products with asbestos impurities, to which Decedent was exposed through his own use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, MERCK & CO., INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to Dr. Scholl's and Lotrimin foot powder with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

hh. The Defendant MINERALS TECHNOLOGIES INC. was authorized to do business in the State of Indiana while engaged, directly or indirectly, in the testing of talcum powder products. MINERALS TECHNOLOGIES INC. is sued as a Product Defendant. Furthermore, this Defendant has done and does substantial business in the State of Indiana, including the sale and distribution of its dangerous and/or defective products and services in the State of Indiana.

ii. The Defendant MIYOSHI AMERICA, INC., was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same

household and sharing a bathroom. Further, MIYOSHI AMERICA, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, L'Oréal, Estée Lauder and Mary Kay cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

jj.  The Defendant NOXELL CORPORATION, a subsidiary of Coty Inc., was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, NOXELL COPORATION manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, CoverGirl cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

kk. The Defendant PECOS RIVER TALC LLC was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, PECOS RIVER TALC LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Johnson & Johnson Baby Powder talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

ll. The Defendant, PFIZER INC., individually and as successor-in-interest to Coty Inc. and Coty International, Inc. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, PFIZER, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not

limited to, Gold Bond and Coty cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

mm.     The Defendant RALPH LAUREN CORPORATION was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, RALPH LAUREN CORPORATION manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Polo body talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

nn.  The Defendant SAFEWAY INC. was or is engaged in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, rebranding, or the like and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic,

medicated, and/or powdered products to which Decedent was exposed through his own personal use and/or through use by his family members. Further, SAFEWAY INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to multiple name brands of cosmetic and body talc powder products, which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

oo. The Defendant SANOFI-AVENTIS U.S. LLC, individually and as successor-in-interest to Gold Bond Co LLC, was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, SANOFI-AVENTIS U.S. LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Gold Bond talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

pp. The Defendant SCHOLL'S WELLNESS COMPANY LLC was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like and/or supplying asbestos-containing products, including cosmetic talc products with asbestos impurities, to which Decedent was exposed through his own use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, SCHOLL'S WELLNESS COMPANY LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to Dr. Scholl's and Lotrimin foot powder with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

qq. The Defendant SPECIALTY MINERALS INC. was authorized to do business in the State of Indiana while engaged, directly or indirectly, in the testing of talcum powder products. SPECIALTY MINERALS INC. is sued as a Product Defendant. Furthermore, this Defendant has done and does substantial business in the State of Indiana, including the sale and distribution of its dangerous and/or defective products and services in the State of Indiana.

rr. The Defendant THE STEPHAN CO., individually and as successor-by-merger to Old 97 Company, was or is engaged in the business of manufacturing, importing,

compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through his own personal use and/or through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, THE STEPHAN CO. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to, Gold Bond talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

ss. The Defendant TARGET CORPORATION was or is engaged in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, rebranding, or the like and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products to which Decedent was exposed through his own personal use and/or through use by his family members. Further, TARGET CORPORATION manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to multiple name brands of cosmetic and body talc powder products, which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State

118

of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

tt. The defendant ULTRA CHEMICAL, INC. was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like, and/or supplying asbestos-containing products, to which Decedent was exposed through use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, ULTRA CHEMICAL, INC. manufactured, distributed, sold and supplied substantial amounts of asbestos talc materials used in cosmetics and the personal care industry, including but not limited to, Estée Lauder cosmetic talcum powder products with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

uu. The Defendant WALGREEN CO. was or is engaged in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, rebranding, or the like and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products to which Decedent was exposed through his own personal use and/or through use by his family members.  Further, WALGREEN CO. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing

products, including but not limited to multiple name brands of cosmetic and body talc powder products, which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

vv. The Defendant WALMART INC. was or is engaged in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, rebranding, or the like and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products to which Decedent was exposed through his own personal use and/or through use by his family members. Further, WALMART INC. manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to multiple name brands of cosmetic and body talc powder products, which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

ww.    The Defendant YELLOW WOOD PARTNERS, LLC was or is engaged in the business of manufacturing, importing, compounding, selling, assembling, marketing, distributing, rebranding, or the like and/or supplying asbestos-containing products, including cosmetic talc products with asbestos impurities, to which Decedent was

exposed through his own use and/or use by family members of these talc products. Decedent was exposed to fibers from these products by family members through his daily interactions, including but not limited to personal interactions, living in the same household and sharing a bathroom. Further, YELLOW WOOD PARTNERS, LLC manufactured, distributed, sold and supplied substantial amounts of asbestos-containing products, including but not limited to Dr. Scholl's and Lotrimin foot powder with asbestos impurities which exposed Decedent to respirable asbestos fibers in the State of Indiana and/or other states. At all times relevant herein the manufacture, sale, distribution, actions and/or inactions of this Defendant in the State of Indiana and/or other states caused and/or contributed to cause his malignant mesothelioma and subsequent death.

## COUNT I: PRODUCT DEFENDANTS
### GENERAL ALLEGATIONS

283. Plaintiffs have been informed and believe, and thereon allege, that progressive lung disease, mesothelioma and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to asbestos and asbestos-containing products over a period of time.

284. Decedent was exposed to asbestos from Product Defendants' asbestos containing talc products.

285. These exposures contributed to cause Decedent's injury, disease, and subsequent death.

286. Product Defendants manufactured, designed, assembled, fabricated, produced, constructed, relabeled, specified, altered, modified, sold, put into the stream of commerce, and/or

otherwise prepared asbestos containing talc products or asbestos containing component parts of talc products.

287. Product Defendants were engaged in the business of selling or leasing asbestos containing talc products for resale, use, or consumption.

288. Product Defendants knew or should have known their talc products contained asbestos.

289. Product Defendants' products or goods were being used in the manner and for the purpose which they were intended, or in a reasonably foreseeable manner at the time asbestos was released from them.

290. Product Defendants mined and/or sold commercial asbestos-containing talc or talcum-powder products.

291. Product Defendants' asbestos or asbestos-containing talc products were dangerous beyond the knowledge or reasonable expectations of persons using and/or applying cosmetic and body talc powder products, including Decedent.

292. Product Defendants' asbestos-containing talc products were unreasonably defective at the time they were sold.

293. Product Defendants' products were not substantially altered in any manner which could not be reasonably foreseen by Products Defendants.

294. Product Defendants failed to conduct tests on the asbestos-containing talc products manufactured, sold or delivered by Product Defendants in order to determine the hazards to which consumers such as Decedent might be exposed while using and/or applying cosmetic and body talc products.

## COUNT II: PRODUCT DEFENDANTS
### MANUFACTURING DEFECT

295. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

296. Product Defendants' products were not designed to contain or release asbestos during normal usage of the product.

297. Product Defendants' asbestos containing talc products were manufactured in such a manner that they would release asbestos during normal usage of the product.

## COUNT III: PRODUCT DEFENDANTS
### FAILURE TO WARN

298. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

299. Product Defendants failed to exercise reasonable care in providing warnings or instructions.

300. Product Defendants failed to supply adequate warnings to persons using and/or applying their asbestos containing talcum powder products.

301. Product Defendants failed to provide warnings about the dangers of the asbestos in their products to consumers.

## COUNT IV: PRODUCT DEFENDANTS
### DESIGN DEFECT

302. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein

303. Product Defendants failed to exercise reasonable care in designing its asbestos containing talc products.

304. Product Defendants' products included, specified the use of, or were designed to be used with asbestos or asbestos containing talc products

305. Product Defendants knew or should have known their talc products contained asbestos

306. Product Defendants designed their talc products in such a manner as they would release asbestos dust in their regularly intended usage

307. Product Defendants continued using or specifying the use of asbestos containing talc in or with their products even after Product Defendants became aware that exposure to asbestos could be hazardous

308. There were adequate substitutes for asbestos in Product Defendants' asbestos containing talc products for example, cornstarch.

309. Product Defendants' asbestos or asbestos-containing talc products were designed to be used and were intended to be used by and around persons without any knowledge about the dangers of asbestos or safe practices in using asbestos containing talc products or being around others using asbestos containing talc products.

## COUNT V: NEGLIGENCE

310. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

311. At all times herein mentioned, each of the named Defendants was an entity and/or the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, or division of an entity, engaged in the business of researching, studying, manufacturing, fabricating, designing, modifying, labeling, instructing, assembling,

distributing, leasing, buying, offering for sale, supplying, selling, inspecting, marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain product, namely asbestos containing talc, other talc products containing asbestos, and products manufactured for foreseeable use with asbestos talc products.

312. At all times herein mentioned, Defendants singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately warned or failed to warn of the health hazards, failed to provide adequate use instructions for eliminating the health risks inherent in the use of the products, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos containing talc, other talc products containing asbestos, and products manufactured for foreseeable use with asbestos talc products, in that said products caused personal injuries to Decedent and others similarly situated, (hereinafter collectively called "exposed persons"), while being used for their intended purpose and in a manner that was reasonably foreseeable.

313. The asbestos and asbestos-containing talc products were defective and unsafe for their intended purpose in that there was an alternative for asbestos-containing talc that could have been used as the product or as a component instead of asbestos-containing talc within a normally asbestos-containing talc/utilizing product. Said alternatives would have prevented the Defendants' asbestos and asbestos-containing talc products from causing Decedent's mesothelioma, due to an inability of any asbestos-alternative to penetrate the pleural lining of Decedent's lung, even if inhaled. Said alternatives came at a comparable cost to each of the Product Defendants. Said alternatives were of comparable utility to the asbestos or asbestos-

containing talc products of Defendants. The gravity of the potential harm resulting from the use of Defendants' asbestos or asbestos-containing talc products, and the likelihood such harm would occur to users of its products, far outweighed any additional cost or marginal loss of functionality in creating and/or utilizing an alternative design, providing adequate warning of such potential harm, and/or providing adequate use instructions for eliminating the health risks inherent in the use of their products, thereby rendering the same defective, unsafe and dangerous for use by Decedent and/or his family members. The Product Defendants had a duty to exercise due care in the pursuance of the activities mentioned above and Defendants, each of them, breached said duty of due care.

314. At all times relevant, the Defendants were aware of their asbestos and asbestos-containing talc products' defect but failed to adequately warn Decedent, Decedent's family members and/or others in their vicinity, as well as failed to adequately warn others of the known hazards associated with their products and/or failed to recall or retrofit their products. A reasonable manufacturer, distributor, or seller of Defendants' products would have, under the same or similar circumstances, adequately warned of the hazards associated with their products.

315. Decedent and/or his family members used, handled or were otherwise exposed to asbestos and asbestos-containing talc products referred to herein in a manner that was reasonably foreseeable.

316. Defendants' conduct and defective products as described in this cause of action were a direct cause of Decedent's injuries and subsequent death, and all damages thereby sustained by Decedent. Plaintiffs therefore seek all compensatory damages in order to make them whole, according to proof.

317. In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, failing to recall or retrofit, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-containing talc products or products manufactured for foreseeable use with asbestos talc products, Defendants did so without disregard for the safety of "exposed persons" who came in contact with asbestos and asbestos-containing talc products, in that Defendants had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos, asbestos-containing talc products or products manufactured for foreseeable use with asbestos talc products, including, but not limited to, asbestosis, mesothelioma, lung cancer, and other lung damages. This knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of Defendants.

318. Defendants were aware that members of the general public and other "exposed persons," who would come in contact with their asbestos and asbestos-containing talc products, had no knowledge or information indicating that asbestos, asbestos-containing talc products, or products manufactured for foreseeable use with asbestos talc products, could cause injury, and Defendants each of them, knew that members of the general public and other "exposed persons," who came in contact with asbestos and asbestos-containing talc products or products manufactured for foreseeable use with asbestos talc products, would assume, and in fact did assume, that exposure to asbestos and asbestos-containing talc products was safe, when in fact said exposure was extremely hazardous to health and human life.

319. The above-referenced conduct of Defendants was motivated by the financial interest of Defendants and each of them, in the continuing, uninterrupted research, design,

modification, manufacture, fabrication, labeling, instructing, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection, marketing, warranting, rebranding, manufacturing for others, packaging and advertising of asbestos, asbestos-containing talc products and products manufactured for foreseeable use with asbestos talc products. Defendants were consciously willing and intended to permit asbestos and asbestos-containing talc products to cause injury to "exposed persons" without warning them of the potential hazards and further induced persons to work with and be exposed thereto, including Decedent.

320. Decedent and/or his family members did not know of the substantial danger of using Defendants' asbestos-containing talc products. The dangers inherent in the use of these products were not readily recognizable by Decedent and/or his family members. Defendants further failed to adequately warn of the risks to which Decedent, his family members and others similarly situated were exposed.

321. Defendants are liable for the fraudulent, oppressive, and malicious acts of their officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, as set forth herein.

322. As a direct and proximate result of the aforesaid negligent acts and/or omissions by the Defendants, the Decedent developed mesothelioma, as a consequence of which, through no fault of his own, he was severely injured, disabled and damaged, to and including his death.

323. As a result of the above, Plaintiffs seek damages as are hereinafter demanded.

## COUNT VI: SURVIVAL

324. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

325. Decedent had an asbestos-related disease at time of death.

326. Decedent's asbestos-related disease was caused by asbestos attributable to Defendants, as set forth in this Complaint.

327. Defendants' actions or omissions as set forth in this were malicious, fraudulent, grossly negligent or oppressive, and were not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

328. Decedent's Estate brings or maintains this action to recover all damages which would have been available to Decedent against Defendants had he lived, including, without limitation, pain, suffering, mental anguish, disability, medical expenses, lost income, loss of earning potential, decreased life expectancy, loss of enjoyment of life, loss of care, comfort, companionship and consortium, and all other compensatory and punitive damages.

## IV.  RELIEF

### A. Spousal Damages

329. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

330. Jennifer Winter was at all times relevant married to Decedent, Edward Jordan Winter, and is Decedent's surviving spouse.

331. As a result of Defendants' conduct as set forth in this Complaint, Jennifer Winter suffered injuries including loss of Decedent's consortium, love, care, affection, services, and income.

332. In addition to the claims asserted by the Personal Representative of Decedent's Estate, as set forth in this Complaint, brings all claims personally available to Spouse under the Wrongful Death Act or Survival Act.

### C. Minor Children Damages

333. J.W. (minor), E.W. (minor), C.W. (minor), and V.W. (minor) are Decedent's, Plaintiff and Personal Representative Jennifer Winter's minor children.

334. Plaintiff and Personal Representative Jennifer Winter at all times relevant is next friend of J.W. (minor), E.W. (minor), C.W. (minor), and V.W. (minor).

335. As a result of Defendants' conduct as set forth in this Complaint, J.W. (minor), E.W. (minor), C.W. (minor), and V.W. (minor) suffered injuries including loss of Decedent's consortium, love, care, affection, services, and income.

336. In addition to the damages asserted by the Personal Representative of Decedent's Estate, as set forth in this Complaint, Personal Representative Jennifer Winter requests all damages available to the Minor Children under the Wrongful Death Act or Survival Act.

## B. Damages

337. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

338. Without limitation to any other damages set forth in this Complaint, Plaintiffs request all damages available pursuant to the Wrongful Death Act, or, in the alternative, all damages available pursuant to Indiana's Survival Act.  Plaintiff additionally requests all costs, expenses, interest, and attorney fees available by law.

339. Plaintiffs request all damages available by law, including without limitation pain, suffering, mental anguish, disability, medical expenses, lost income, loss of earning potential, decreased life expectancy, loss of enjoyment of life, loss of care, comfort, companionship and all other compensatory damages.

340. Defendants' actions and/or inaction as set forth in this Complaint were done with malice, gross negligence, and/or willful and wanton conduct, and were more than ordinary negligence and Plaintiffs request all damages available under Ind. Code 34-51-3-1, *et. seq*.

341. To the extent any claims in this matter are governed by the law of any foreign state or jurisdiction other than the State of Indiana, Plaintiffs demand all damages available under any foreign state law which may apply to any particular Defendant or claim.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury.

## V. CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this Complaint (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the Complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted this August 12, 2025

*/s/ **Sarah Broderick***
Kathleen A. Farinas, 20283-34
Todd Barnes, 25904-49
Sarah Broderick, 31908-49
DOBS & Farinas, LLP
951 N. Delaware St.

Indianapolis, IN 46202
(O)(F) (317) 854-3003
kfarinas@dobslegal.com
tbarnes@dobslegal.com
sbroderikc@dobslegal.com

ATTORNEYS FOR PLAINTIFFS